NO. 13-1170

In The

# United States Court of Appeals

For The Fourth Circuit

## NARENDRA MAVILLA; PADMAVATHI MAVILLA

Plaintiffs-Appellants

v.

ABSOLUTE COLLECTION SERVICE, INC.

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  Eastern District of North Carolina                AT Raleigh

PLAINTIFFS-APPELLANTS'

OPENING BRIEF

Christopher W. Livingston, Esq.
North Carolina State Bar No. 27282
PO Box 220
White Oak NC 28399
Phone 910 876 7001
Fax 910 866 5297

Sean T. Partrick, Esq.
North Carolina State Bar No. 25176
Yates, McLamb & Weyher, LLP
PO Box 2889
Raleigh NC 27602
Phone 919 835 0900, Fax 919 835 0910

Counsel for Plaintiffs-Appellants                Defendant-Appellee

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-1170__    Caption:  Mavilla v. Absolute Collection Service, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Narendra Mavilla and Padmavathi Mavilla
(name of party/amicus)

husband and wife

who is _____Plaintiffs-Appellants_____, makes the following disclosure:
(appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/Christopher W. Livingston__    Date: ____29 April 2013____

Counsel for: __Plaintiffs-Appellants__

## CERTIFICATE OF SERVICE
**************************

I certify that on ____29 April 2013____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__/s/Christopher W. Livingston__    ____29 April 2013____
(signature)    (date)

*Mavilla v. Absolute Collection Svc.* 13-1170
Appellants' Opening Brief page ii

07/19/2012
SCC

- ii -

# TABLE OF CONTENTS

Corporate Disclosure Statement ...................................................i

Table of Contents ..................................................................iii

Table of Authorities ...............................................................v

Jurisdictional Statement ..........................................................1

Statement of the Issues Presented for Review ................................1

Statement of the Case ...........................................................2

Statement of Facts ...............................................................3

Summary of the Argument .......................................................15

Argument .........................................................................17

1. THE DISTRICT COURT ABUSED ITS DISCRETION IN SETTING ASIDE DEFAULT AND ALLOWING ACS TO DEFEND. ....................17

    Standard of Review .......................................................17

    The District Court Violated Its Own Local Rules ............................18

    ACS Showed No Good Cause ............................................24

2. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR ACS AND DENYING PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION ON ALL FDCPA CLAIMS............31

    Standard of Review..........................................................31

    Strict Liability Is the Law of the Fourth Circuit ..............................32

    Collecting Stale Debt Requires Disclosure of Staleness..................34

    ACS Deliberately Re-Aged the False Debts .....................................36

ACS Cannot Prove Its Pleaded Affirmative Defenses ......................37

Damages ......................................................................43

3. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR ACS AND DENYING PLAINTIFFS' SUMMARY JUDGMENT MOTION ON PLAINTIFFS' FCRA CLAIMS. ..................44

Standard of Review ......................................................44

FCRA Investigation Is No Simple Matter ...........................45

FCRA Gives No 30-Day Safe Harbor ...............................47

Damages ......................................................................49

4. THE DISTRICT COURT MUST DECIDE PLAINTIFFS' STATE LAW CLAIMS UPON REMAND. .........................................................50

Standard of Review .........................................................51

The District Court Must Decide the State Claims on Remand ..........52

Conclusion ........................................................................53

Signature of Counsel ...........................................................54

Certificate of Compliance ......................................................55

Certificate of Service ...........................................................56

# TABLE OF AUTHORITIES

## CASES

*Adams v. Trs. of the Univ. of N.C.- Wilmington*,
 640 F.3d 550 (4th Cir. 2011) ...........................................................32, 44-45

*Allen ex rel. Martin v. LaSalle Bank, N.A.,* 629 F.3d 364 (3d Cir. 2011) ....34

*Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*,
 843 F.2d 808, 812 (4th Cir. 1988) ......................................................26, 29, 30

*Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383 (D.Del. 1991) ..............40

*Booth v. Maryland*, 327 F.3d 377 (4th Cir. 2003) .........................................23

*Burch v. Dunn*, No. 06-2293, 2007 U.S. App. LEXIS 12890 (4th Cir. Jun. 4,
2007) ..............................................................................................................25

*Cahlin v. Gen. Motors Acceptance Corp.*,
 936 F.2d 1151 (11th Cir. 1991) ...................................................................46

*Clark v. Capital Credit & Collection Svcs., Inc.*,
 462 F.3d 1162 (9th Cir. 2006) .........................................................40-41, 42

*Colleton Prep. Acad., Inc. v. Hoover Universal*,
 616 F.3d 413 (4th Cir. 2010) .................................................22-23, 24, 28, 29

*Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*,
 383 F.2d 249 (4th Cir. 1967) .................................................17, 20-22, 23, 24

*Donohue v. Quick Collect, Inc.*, 592 F.3d 1027 (9th Cir. 2010) ...................34

*Dunn v. Burch (In re Burch Co.)*, Nos. 3:05-cv-00240, 04-03236, 2006 U.S.
Dist. LEXIS 81193 (W.D.N.C. Nov. 6, 2006) .............................................25

*Easley v. Kirmsee*, 382 F.3d 693 (7th Cir. 2004) ..........................................29

*Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130 (2d Cir. 2010) .................34

*Hawkspere Shipping Co. v. Intamex, S.A.*,
  330 F.3d 225 (4th Cir. 2003) ...............................................31, 44

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
  354 F.3d 277 (4th Cir. 2004) (*en banc*) .................................32, 44

*Howe v. Reader's Digest Ass'n, Inc.*, 686 F. Supp. 461 (S.D.N.Y. 1988) ....40

*Jenkins v. Heintz*, 124 F.3d 824 (7th Cir. 1997) .....................................42-43

*Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997) ................................51-52

*Jenkins v. NCDMV*, 244 N.C. 560, 94 S.E.2d 577 (1956) ..........................26

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
  559 U.S. 573 (2010) ....................................................................38

*Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426 (4th Cir. 2004) .........46

*LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185 (11th Cir. 2010) ...........34

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (*en banc*) ............23

*Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008) ........................51

*New Beckley Mining Corp. v. Int'l Union, United Mine Workers*,
  18 F.3d 1161 (4th Cir. 1994) .......................................................52

*Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894 (4th Cir. 1987) .............28-29

*Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986) .....................................46

*Reichert v. Nat'l Credit Sys.*, 531 F.3d 1002 (9th Cir. 2008) .................41, 43

*Robinson v. Equifax Info. Svcs., LLC*, 560 F.3d 235 (4th Cir. 2009) ...........47

*Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403 (4th Cir. 2010) ....27, 29

*Ruth v. Triumph P'ships*, 577 F.3d 790 (7th Cir. 2009) ...............................34

*RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350 (4th Cir. 2007) .17

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) ....................................45

*Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142 (4th Cir. 2008) .....50

*Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007) ....................34

*Sloane v. Equifax Info. Svcs., LLC*, 510 F.3d 495 (4th Cir. 2007) ...............47

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) ..................................51

*United States v. Moradi*, 673 F.2d 725 (4th Cir. 1982) ................................29

*Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365 (4th Cir. 2012) ..........33-34

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ...............17

*Whitley's Electric Svc., Inc. v. Sherrod*,
 293 N.C. 498 238 S.E.2d 607 (1977) .........................................................36

*Wilhelm v. Credico, Inc.*, 519 F.3d 416 (8th Cir. 2008) .........................41, 42

*Williams v. Blitz*, 226 F.2d 463 (4th Cir. 1955) ...........................................30

## STATUTES

15 U.S.C. § 1681 ...............................................................................1

15 USCS § 1681i .........................................................................45, 48

15 USCS § 1681n ...............................................................................50

15 USCS § 1681o .........................................................................46, 49

15 U.S.C. § 1681s-2 ...........................................................45, 46, 48, 50

15 U.S.C. § 1692 .............................................................................1, 15

15 U.S.C. § 1692a ................................................................32-33

15 U.S.C. § 1692d .................................................................40

15 U.S.C. § 1692e ....................................................33, 35, 36, 40

15 U.S.C. § 1692f ...................................................................35

15 U.S.C. § 1692k .........................................................26, 33, 37, 38

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

28 U.S.C. § 1367 ...................................................................51

NCGS § 1-52 .......................................................................35

NCGS § 58-70-1 ....................................................................13

NCGS § 58-70-115 ..................................................................35

## RULES

E.D.N.C. L.R. 6.1 ...................................................................18

FRAP 4(a)(1)(A) .....................................................................1

Fed.R.Civ.P. 8(b) ................................................................23-24

Fed.R.Civ.P. 12(b) .........................................................23, 28, 37

Fed.R.Civ.P. 55(c) ....................................................15, 17, 18, 24, 29

Fed.R.Civ.P. 56(a) ............................................................32, 44

Fed.R.Civ.P. 59(e) .................................................................29

Fed.R.Civ.P. 60(b) .............................................................17, 29

**OTHER AUTHORITIES**

*Am. Heritage Dictionary* 920 (4th ed. 2000) ................................................46

*Webster's Third New Int'l Dictionary* 1189 (1981) ......................................46

# JURISDICTIONAL STATEMENT

Plaintiffs' Complaint brought claims expressly under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs appeal from a final order of the district court that disposed of all parties' claims and defenses and left no work for the district court to do, conferring appellate jurisdiction upon the Court of Appeals per 28 U.S.C. § 1291. Said order and its associated judgment were signed and filed with the clerk of the district court no earlier than 10 January 2013. Plaintiffs filed their Notice of Appeal no later than 06 February 2013, which was less that the 30 days allowed per FRAP 4(a)(1)(A).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the district court abuse its discretion in setting aside the clerk's default for good cause when ACS did not appear until more than six months after its owner/registered agent was served with process?

2. Did the district court err as a matter of law in entering summary judgment for ACS on Plaintiffs' FDCPA claims?

3. Did the district court err as a matter of law in entering summary judgment for ACS on Plaintiffs' FCRA claims?

# STATEMENT OF THE CASE

JA = Joint Appendix with page reference.

Plaintiffs commenced the action by filing their complaint with the district court on or about 04 October 2010, JA14-19, issuance of summonses the following day, JA2, and serving process on Defendant ACS's registered agent, company owner Harry W. Scott, Jr., JA177, by certified mail effective 08 October 2010. JA2. Plaintiffs never served, and dismissed without prejudice on 14 January 2011, Defendant WakeMed Faculty Practice, JA73, which they later learned was only a d/b/a of North Carolina corporation WakeMed Faculty Practice Plan.

ACS did not answer the complaint by 14 December 2010, when the district court clerk mistakenly issued a 120-day order to make service within 14 days. JA20. The same day, Plaintiffs filed proof of service and moved for default, which the clerk entered on 21 December 2010. JA21-23. Plaintiffs then moved for default judgment, attaching a number of exhibits and a memorandum in support, on 10 January 2011, followed the next day by a supplement and more exhibits. JA24-63. On 14 January 2011, Plaintiffs submitted more exhibits, consented to the magistrate judge, and requested a default judgment hearing. JA64-72.

Instead, on 18 January 2011 the district court ordered Plaintiffs to file more evidence and legal authority by 08 February. JA74-76. Plaintiffs did so, four days early. JA77-91. On 20 April 2011, the district court had taken no action on any of

Plaintiffs' material when ACS entered notice of appearance, and the next day moved to set aside entry of default. JA92-102. Plaintiffs opposed it on 25 April 2011. JA103-119. The next day, the district court held the default judgment motion in abeyance. JA120-21. Three months later, the district court set aside entry of default. JA122-30. ACS filed its answer on 15 August 2011, more than ten months after service of process. JA131-37.

After discovery, both sides moved for summary judgment. JA138-43, 199-200. On 10 January 2012, the district court entered final summary judgment on all federal claims in favor of ACS, dismissing Plaintiffs' state law claims without prejudice. JA319-46. Plaintiffs appealed on 06 February 2013. JA347-48.

## STATEMENT OF FACTS

This appeal is from a final summary judgment and also from an order granting a motion set aside entry of default, so the facts below are cast in the light most favorable to the nonmovants.

Plaintiff-Appellant Padmavathi Mavilla gave birth to her last child in October 2001 and opted for bilateral tubal sterilization on 09 October 2001, becoming permanently unable to bear children from that date. JA42, 78, 80. She has never received Medicaid. JA43-44. She lived in California until 03 December 2003. JA38.

WakeMed Faculty Practice Plan (hereinafter WakeMed) is a corporation

organized under North Carolina law that does business as WakeMed Faculty Physicians. JA309. On or before 02 April 2009, WakeMed created false medical records purporting to prove that WakeMed provided prenatal and obstetric care to Mrs. Mavilla on or about 04 and 22 June 2003, 13 and 30 June 2005, and 26 July 2006, for which Medicaid supposedly partly repaid WakeMed, but for which she supposedly owed WakeMed a total of $492. JA30-32, 202-03, 205.

On or about 10 April 2009 (the "imported" date), WakeMed electronically transmitted this false information to Defendant-Appellee Absolute Collection Service, Inc. (ACS, which has apparently changed its name to FKAACS, Inc. but is still called ACS hereinafter for ease of reference), holder of North Carolina Department of Insurance collection agency permit 988 (in very fine print at the very foot of its dunning letters, JA26) for collection. JA202, 205. ACS's policy is never to verify WakeMed accounts independently and always to believe everything WakeMed tells it without question, and apparently never to credit evidence tending to disprove any WakeMed alleged debt. JA182-83.

```
12      Q:   How can you prove that Mrs. Mavilla ever owed
13   these debts and that these services were ever performed?
14            MR. PARTRICK:  Object to the form.
15      A:   The first question, the account was first
16   electronically placed with us by WakeMed.  That's our
17   first basis that the debt was for Mrs. Mavilla.
18   Subsequently, we also received an itemized bill from
19   WakeMed that listed the charge as being for Mrs. Mavilla.
20   So that's two times that WakeMed proved to us that the
21   charges belonged to Mrs. Mavilla.
```

22   Q:   And so that's all the proof you need, is an
23   account statement like this?
24        MR. PARTRICK:  Object to the form.  You
25   can answer.
 1   A:   WakeMed provided those charges as for Mrs.
 2   Mavilla, and it's our responsibility to attempt to
 3   collect on those charges.
...
[page 34]
 8   Q:   So there's no way, then, of once you get an
 9   itemized bill from WakeMed, there's no way ever that a
10   consumer can ever prove that it's not theirs and to get
11   you to stop collecting it?
12        MR. PARTRICK:  Object to the form.
13   A:   That's a pretty vague question.  Again, in
14   this case and what I know of this case, we had two
15   occasions where WakeMed confirmed that the charges were
16   for Mrs. Mavilla, the placement of that account and the
17   itemized bill for that account.

Beginning on or about 11 April 2009, ACS placed at least 21 "aggressive, disrespectful, and humiliating" calls, JA78, 80, fifteen before 01 October 2009 and six after, to the Mavilla household where she and her husband Plaintiff-Appellant Narendra Mavilla lived, attempting to collect debts that Mrs. Mavilla never owed and could not possibly have owed.  JA203-04, 206, 208-09.

During many of these phone calls, the Mavillas told ACS that the debt was not theirs and could not have been theirs because Mrs. Mavilla had been incapable of bearing children after 2001 and in any event did not give birth to any children after 2001, as confirmed in the Mavillas' affidavits, JA79, 81, and ACS's own phone notes. "4/15/09 - Barbara Jenkins- Patient said she didn't rec'd the services,

will call client ? ( i didn't suggested it)"  JA204, 206.  "9/1/09 – Tim Vancelette- ... Per CMAIDX system, debtor stated acct. is not hers[.]"  JA208.

On or about 14 April 2009, ACS dispatched three dunning letters through the U.S. Mail to Mrs. Mavilla at her correct address, demanding payment of $126 for services (not) rendered on 13 June 2005, JA26; $54 for services (not) rendered on 30 June 2005, JA27; and $312 for services (not) rendered on 26 July 2006. JA28.

On or about 16 April 2009, ACS dispatched through the U.S. Mail to Mrs. Mavilla at her correct address a set of completely false itemized medical bills from WakeMed, purporting to prove that Mrs. Mavilla had received prenatal and obstetric care years after she had been surgically sterilized and that she had been a Medicaid recipient.  JA30-32.

On or about 03 June 2009, ACS dispatched three more dunning letters through the U.S. Mail to Mrs. Mavilla at her correct address, demanding payment for the alleged debts that Mrs. Mavilla never incurred, and threatening: "Be advised that since you did not respond to our initial request for payment, we have initiated further, more serious collection activity.  You can prevent this from appearing on your credit report by contacting our office immediately with payment in full or to make satisfactory payment arrangements."  JA34-36.

In response to the continuing collection calls from ACS, the Mavillas mailed

dispute letters to WakeMed and ACS on or about 21 July 2009, truthfully denying receipt of any services from WakeMed and ever having been on Medicaid, and further pointing out that she was in California until 03 December 2003. JA38. ACS continued to telephone the Mavillas' home, so on or about 24 August 2009, they mailed a cease-communication letter to ACS, effective "immediately, until the dispute has been resolved with Wakemed." JA39.

Also on 24 August 2009, the Mavillas mailed and/or faxed a dispute letter to WakeMed, truthfully reminding it that Mrs. Mavilla could not possibly have received any of the alleged services, never had a Medicaid account, and owed WakeMed nothing. JA40. ACS's collection notes for 01 September 2009 acknowledged: "Tim Vancelette-Rcvd. note from debtor stating all calls & letters are to cease until dispute w/WMC is resolved. ... Marked disputed and placed on C&D." JA208. WakeMed employees Delora Rogers and Mary Faulk actually worked not at WakeMed's campus but in the same building and same floor as ACS's office complex. JA193.

ACS lets a computer program decide when and whether to furnish information to credit reporting bureaus, and does not verify this information beforehand. JA183.

```
18    Q:   What human beings are responsible for
19  reporting credit items at ACS?
20    A:   No human beings do the credit reports.
21    Q:   It's just a machine that automatically reports
```

22  trade lines on people's credit, just a computer program?
23     A:   We have an interface from our computer to the
24  credit bureaus to report unpaid debts.
25     Q:   Who makes the decision to report these trade
 1  lines?
 2     A:   I don't know who does -- who makes the
 3  decision.
 4     Q:   How could I find out who at ACS decides to
 5  place these trade lines?
 6     A:   I could ask.
 7     Q:   And what human beings check these trade lines
 8  or credit information for accuracy and truthfulness
 9  before it's furnished to the credit bureaus?
10     A:   No human beings.

In keeping with this policy, ACS furnished eight collection tradelines to credit

reporting bureaus on or about 07 November 2009 to be placed on Mrs. Mavilla's

consumer credit reports, indicating that she had not paid a total of $492 for medical

services, without disclosing that she had never received any such services. JA49-

51.  ACS so informed Mrs. Mavilla in two dunning letters dated 17 November

2009, which promised: "You can save yourself a great deal of trouble by mailing

your payment to our office today."  JA46-47.  "Q: You are aware this has very,

very serious consequence to people's credit, right?  A: Yes."  JA183.  ACS "re-

aged" the collection items, that is, altered their opening dates from June 2005 or

July 2006 to April 2009.  JA49-51, 202, 203, 205.

On or about 28 December 2009, Plaintiffs against their will paid $180 to

ACS by credit or debit card or electronic check.  JA202, 203, 205.  ACS received a

contingent fee for this.  JA178, 14:25-15:5.  Nowhere in the record did ACS

disclose what rights and defenses the Mavillas might be giving up by making payment on an alleged debt more than three years after its last activity, or that paying off a collection item in full would not improve the Mavillas' credit scores.

In September 2010, Mrs. Mavilla applied for a Kohl's store credit card, but received notice dated 21 September 2010 that she had been rejected on grounds including "Credit Report Shows Too Few Trades Paid As Agreed." JA55. As of September 2010, the interest rate on the Mavillas' fixed-rate mortgage was 5.5% and their monthly principal and interest payment was $1,325.97 on a remaining principal balance of about $210,000. JA60. The Mavillas applied for a refinance of their mortgage at 3.5% for 25 years. JA79, 81. They were denied refinancing because of ACS/WakeMed/s false tradelines. JA57-58. According to standard mortgage calculation software, a 3.5% refinance would have lowered the Mavillas' monthly payment to $1,057.94 before escrow, a savings of $268.03 per month, totaling $80,409.00 over the 300-month term. JA79, 81.

On or about 26 September 2010, the Mavillas disputed the ACS/WakeMed tradelines through the credit bureaus, who communicated the dispute to ACS through E-OSCAR, ACS's "electronic interface that we have with the credit bureaus." JA189 58:22-23. Without conducting a reasonable investigation and despite the Mavillas' truthful denials of owing any money to WakeMed, ACS reported back to the credit bureaus on or about 27 September 2010: "Vickie

Garrett-RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED[].” JA203, 206, 208.

On or about 27 September 2010, relying solely on ACS's investigation, Equifax wrote the Mavillas as to all three alleged debts: "We have researched the collection account. Account # [redacted] The results are: Equifax verified that this item belongs to you. If you have additional questions about this item please contact: Absolute Collection Service, Raleigh, 421 Fayetteville Street Mall S, Raleigh NC 27601-1792." JA62-63. When questioned about how ACS verified disputed credit information, Mr. Malmfelt said he did not "have personal knowledge but, again, I can find out for you how we go about verifying that." JA189 59:17-18. Mr. Malmfelt never supplemented this answer.

Other than obtaining the amount owed according to the creditor and the amount paid, Mr. Malmfelt was unable to name any other policies or procedures reasonably designed to prevent errors in debt collection. JA185 41:4-42:4. As of commencement of the instant case on 04 October 2010, the false tradelines had been on Mrs. Mavilla's credit reports for 46 full weeks and were still there. JA49-51. Sometime after 04 October 2010, "when we were notified by WakeMed that the charges did not belong to Mrs. Mavilla, we took action to close the account at the credit bureaus and remove the information from our system." JA192 69:3-6. The record does not show any additional or new evidence after the Mavillas'

disputes in August 2009 that either WakeMed or ACS relied on to change their evaluation of the alleged debt from true to false.

Mr. Malmfelt described his own training thus, JA176:

```
12    Q:   All right.  What training and education have
13  you had in compliance with both federal and state fair
14  collection debt laws?
15    A:   I took the mandatory training that's required
16  at Absolute Collection Services.  It covered the
17  statutes.
18    Q:   And how long ago was that?
19    A:   I took it my first week on the job six years
20  ago.
21    Q:   What continuing or recurring education or
22  training have you taken in that area?
23    A:   Nothing formal, but I keep track of any
24  changes in the industry through membership in the ACA.
```

ACS never clarified its answers with specific provisions of consumer protection law that it trains its personnel to watch out for, or produced any documents detailing its compliance training, policies, or procedures.

ACS collection manager Stan Iradi answers Better Business Bureau complaints and acknowledges on ACS's behalf that "[t]he statute of limitations is three years in North Carolina[,]" JA211, but instructs consumers dunned for time-barred debts to pay anyway or to set up a payment plan, regardless of how old the debt is.  JA211-14 also shows that a significant number of consumers that ACS duns do not in fact owe anything and could not possibly have received whatever services ACS alleges, *e.g.*: "I was sent a bill that is not mine and I wasn't even in

the country during the date they say I was seen at the emergency room ... I have my orders to show that I was stationed in Japan and on temp orders to school in Japan." JA212. "I requested documentation of this debt and was told by the agent that they do not send documentation of the debt. ... [T]here were no bad checks written and they are claiming it is due to a *** loan taken over 4 years ago. When I made it clear, again, that I needed documentation, the response was to the effect that I must know if I ever took a loan out." JA212. "I promptly paid *** Medical in December of 2011. ... When I checked my credit report this morning, I find a single negative entry from them. Given that I had not a single interaction with this company and the bill is paid in full, I want this blemish removed from my credit report from all three credit reporting agencies." JA212.

After entry of default, the Mavillas filed PACER records indicating that ACS had recently defaulted in at least five other debt collection practices lawsuits in at least as many different U.S. District Courts, judgment by default being entered in at least four of them. JA66-72, 90-91, 103-10. In the one matter that ACS agreed to settle, it then chose not to pay the agreed amount, forcing the consumer to move to reopen the case. JA111-13. In their affidavits, Ken Perkins and Chris Malmfelt both stated that ACS had defaulted deliberately and that "all of those cases have been resolved for nominal amounts as planned." JA98, 101.

More than six months after being served, and more than four months after

entry of default against it, which entry the district court clerk served on ACS according to DE9 (and the record address of ACS at the time was owner/registered agent Harry W. Scott, Jr. at ACS's home office), JA2, ACS moved to set same aside, its general counsel Ken Perkins claiming under oath that Plaintiffs' Counsel had verbally agreed in a phone conference to "unlimited extension of time to respond to the Summons and Complaint. Livingston agreed that ACS could have as much time as it needed to respond to the Complaint." JA124. Counsel denied this under oath, stipulating that as of 28 October 2010 he agreed to a 30-day extension with Mr. Perkins, and might have said that he would not default ACS so long as settlement talks continued, but noting that ACS never tried to communicate again, and that it is never his policy to grant unlimited extensions to bill collectors. JA116. Mr. Perkins did not take any further action for more than six months after this talk, when he happened to check PACER on 20 April 2011. JA125.

ACS repeatedly claimed that WakeMed verified the false debts every time it was asked, even though neither WakeMed nor ACS had received any new information from Plaintiffs since August 2009. JA39-40, 41. Nevertheless, on some unspecified date after being sued, Mr. Perkins again let WakeMed know about the dispute, whereupon WakeMed determined (necessarily from the same evidence that it had back in August 2009) that Mrs. Mavilla did not owe the alleged debt after all, whereupon ACS deleted it from her credit report. JA124.

Mr. Perkins also admitted that ACS "purposefully allowed" FDCPA plaintiffs to default it in other cases "to minimize damages and cap at low levels otherwise unreasonable attorney fees that are typically occasioned with FDCPA and similar cases." JA98.

The district court chose to credit Mr. Perkins, set aside default, and allow ACS to answer. The order setting aside default claimed that Counsel "does not reveal, however, how much of an extension he purportedly agreed to honor." JA127. In fact, Counsel's affidavit specified that "said extension was for 30 days, not 'unlimited.'" JA116. Even though ACS had a history of deliberately defaulting when sued in federal court on similar claims of unfair debt collection, the district court disregarded it because: "No history of default has been demonstrated in this court." JA129. Not noting the difference between a final judgment enforceable by execution, lien, levy, and sale and an interlocutory order, the district court held that the only lesser sanction it considered—payment of attorney fees occasioned by default—would be futile. JA129. The district court found "good cause" and set aside default. JA130.

After discovery, both sides moved for summary judgment on liability and actual damages, with the Mavillas reserving punitive and full damages for jury trial. The district court entered summary judgment for ACS on all federal claims, ruling that it was "impossible to determine from the Complaint or memoranda the

specific factual bases upon which the Mavillas rely in alleging ACS violated the alleged subsections of [15 U.S.C.] § 1692," JA342, and declining to exercise pendent jurisdiction over any state claims or to enter declaratory judgment. JA345. Though ACS introduced records of the Mavillas' parallel state case against WakeMed, JA347-304 which Wake County Superior Court dismissed in part ("The Court makes no ruling with respect to Count IV of Plaintiffs' Amended Complaint, which seeks a declaratory judgment." JA304) and which the Mavillas sought to amend, JA305-18, the district court mentioned it only in passing, JA325, and it does not appear to have factored into the result.

## SUMMARY OF THE ARGUMENT

When a large, sophisticated corporation allows default after default against itself, and then shows no Rule 55(c) "good cause" except an alleged verbal extension for failing to answer yet another FDCPA complaint for six months, setting aside default is erroneous as a matter of law. Even if not, ACS waited five months after being served with entry of default to seek relief and then submitted no proposed answer along with its Rule 55(c) motion and put forth no meritorious defenses other than conclusory statements. ACS freely admitted to deliberately defaulting in other cases, which for some reason the district court counted as a positive. Setting aside default was a manifest abuse of discretion.

Strict liability for FDCPA violation is settled law in this circuit.  ACS tried to collect debts that it admitted under oath were false and never owed, were time-barred even had they been real, reported those same false debts to the credit bureaus, changed the dates on them to make them appear more recent and within the statutes of limitation, and caused Plaintiffs to be denied a very advantageous home refinance, inflicting grave financial harm.  ACS is therefore liable for all of it.  The Mavillas sent no new evidence to ACS or WakeMed after August 2009, which ACS chose not to believe at the time.  After being sued, ACS then decided to credit the Mavillas' indisputable information, without explaining why it had not done so before.  However, the district court bent over backwards to excuse ACS's illegal and senseless oppression of a completely innocent family, in defiance of this Court's ironclad precedent that FDCPA protects consumers, not collectors.

FCRA allows 30 days for a furnisher of information to conduct a reasonable investigation, but does not establish a safe harbor against suit once a furnisher has done all the investigation it intends to do.  ACS testified that it lets an automated system furnish credit information without human intervention or approval.  ACS could not describe its procedure or policy for investigating credit disputes.  ACS simply received Plaintiffs' dispute and "verified" the false tradelines the same day. It was entitled to no more chances.

This Court must remand for reinstatement of default, denial of Defendant's

summary judgment motion, entry of partial summary judgment for Plaintiffs' actual and minimum statutory damages, and jury trial for punitive and maximum statutory damages.  The district court must also adjudicate the state claims over which it declined to exercise supplemental jurisdiction.

## **ARGUMENT**

## 1. THE DISTRICT COURT ABUSED ITS DISCRETION IN SETTING ASIDE DEFAULT AND ALLOWING ACS TO DEFEND.

### Standard of Review

For orders setting aside default, the standard of review seems to be abuse of discretion.  "The disposition of motions made under Rules 55(c) and 60(b) is a matter which lies largely within the discretion of the trial judge and his action is not lightly to be disturbed by an appellate court."  *Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967.)  "A district court has abused its discretion if its decision 'is guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)."  *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006).  "By definition, a district court abuses its discretion when it makes an error of law."  *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356 (4th Cir. 2007).  "Further, even if a district court applies the correct legal principles to adequately supported facts, the discretion of the trial court is not subject to automatic affirmance."  *Westberry*, 178 F.3d at 261.

**The District Court Violated its Own Local Rules**

The events below indicate that for all practical purposes the district court has repealed Rule 55 and defendants need no longer give lawsuits filed against them any mind whatsoever for at least six months, rendering any plaintiff's diligence and obedience meaningless because no matter how tardy or perfunctory a defendant's efforts may be and no matter how many times the same defendant has flouted court rules before, henceforth almost no entry of default will ever survive in the Fourth Circuit if the decision below becomes precedent.

For a start, JA128, the district court cited E.D.N.C. L.R. 6.1—

> **Motion for an Extension of Time to Perform an Act.** All motions for an extension of time to perform an act required or allowed to be done within a specified time must show good cause, prior consultation with opposing counsel and the views of opposing counsel. The motion must be accompanied by a separate proposed order granting the motions.

--for the proposition that "verbal extensions ... [are] not permitted in this federal court." Then it proceeded to permit a verbal extension that Plaintiffs' Counsel never even agreed to, excusing ACS for Mr. Perkins' inattention even though he was not an outside lawyer but its general counsel, and blaming Plaintiffs' Counsel for not "attempt[ing] to correct it at the time." JA128. That the district court would criticize counsel for one side for failing to obtain a written extension of time for the *other* side, if such was the "it" to have been "correct[ed]," and on that basis excuse said *other* side from compliance with court rules that are supposed to apply

evenhandedly to everybody is, to say the least, counterintuitive.

Furthermore, the district court scolded Plaintiff's Counsel for "essentially accus[ing] Perkins of perjury with regard to the purported verbal agreement extending ACS's response time." JA125. All Plaintiff's Counsel did was give his side of things, observe that human nature will tend toward not telling the truth if that what it takes to get out of serious financial trouble, and point out the implausibility of an indefinite extension.

It is gravely disappointing that the district court would react this way toward the Mavillas' side and apparently expecting them to meekly concede that the other side must be telling the truth, while scarcely directing a word of criticism, then or later, toward either ACS or WakeMed, who admitted—on the same evidence that they disregarded *before* they got sued—that the Mavillas never owed the debt at all, meaning that they never had any business trying to collect it at all, and that they put a completely innocent family through months of false accusations and harassment and credit damage and anguish for absolutely no reason. The Mavillas' side is at some loss for words in the face of such irrationally disparate treatment.

The district court further faulted the timing of the motion for entry of default, which Plaintiffs filed on the same day that the clerk mistakenly issued a 120-day order to make service within 14 days or show cause why the complaint should not be dismissed—which was to say that the Mavillas, but not ACS, must

obey court rules or lose the case. However, Counsel and Mr. Perkins verbally agreed to a 30-day extension to answer, JA125, and day 21 from service of process fell on Friday 29 October. Day 30 after that was Sunday 28 November, so the parties' informal agreement expired the next day. 14 December was only 15 days later, yet the district court construed forbearance for even this short a time as lack of diligence. Somehow, then, ACS's failure to answer an extremely serious lawsuit or even to check PACER for six months is all right, but when the Mavillas let two weeks pass even though they were by no means required to do anything, and then did everything they had to do thereafter on or ahead of schedule, the district court seized on this to cast ACS as worthy of relief, and to require the case to go on for another year and a half merely to pile up more evidence cumulative to that which the Mavillas had already attached to their default judgment motion.

This case is most like *Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249 (4th Cir. 1967), which no one seems to have located below. There, the defendant's general counsel received process from its registered agent in good time and, not being admitted to that court, dictated a letter to his secretary for mailing to prospective defense counsel, but due to an oversight, defense counsel did not learn of the case until five days after an answer was due. *See* 383 F.2d at 250. The next day, the plaintiff obtained default and judgment thereon. *Id.* Defense counsel phoned plaintiff counsel that same day, but claimed

that plaintiff counsel misled him as to the status of the matter for the next 71 days until finally the defense learned of the default and default judgment. *Id.* Four days after that, defendant moved to set aside, without an accompanying proposed answer. *Id.* at 251. Amid defense allegations, "steadfastly denied," that plaintiff counsel had misled them the whole time, the district court disbelieved the defense and left the default in place, but set aside the judgment, and the plaintiff was able to prove up much of its original case. *Id.* at 250-51.

On appeal, this Court had little sympathy for the defense.

> In this case the defendant did not act promptly. The default was entered on August 26, 1964, and the motion to set it aside was not made until November 10, 1964, after more than two and one-half months had elapsed. Defendant's assertion that it was misled or lulled into slumber by plaintiff's attorneys was rejected by the court below. However, it seems that in any case the reasonable and logical course which defendant should have pursued after it was aware that it had failed to answer in time was to immediately check the official records at the clerk's office in order to determine the posture of the case. In this respect the defendant was negligent and the court, on conflicting evidence, rejected defendant's claim that it had no knowledge of the entry of default.

*Id.* at 251. Here, despite the modern ability to check PACER anytime it wanted, ACS dawdled for six months after service, and four months after the clerk mailed it notice of default, JA2, so as a matter of law, it did not act promptly.

> Furthermore, the defendant did no more than allege in conclusory fashion that it had a meritorious defense. It presented no statement of underlying facts to support this conclusion to enable the court to appraise the merits of the claimed defense. ... We are not persuaded that a bare allegation of a meritorious defense precludes the court, in its discretion, from requiring disclosure of facts to support such a conclusory assertion. We find that the

court did not abuse its discretion, under the circumstances. The defendant did no more than state that plaintiff breached the contract, a mere conclusion which fell far short of providing the court with a satisfactory explanation of the merits of the defense.

*Id.* at 251-52. Here, Mr. Perkins admitted by affidavit that ACS had tried to collect a debt that the Mavillas did not owe, but blamed ACS's client WakeMed for everything, even though ACS never provided evidence that WakeMed had any contradictory information in addition to what ACS had.

"ACS also claims defenses of bona fide error under the FDCPA, contributory negligence by Plaintiffs, and failure to mitigate damages by Plaintiffs, among other standard defenses. Based upon the events and circumstances described above, it is my belief that the entry of default and default judgment obtained by Plaintiffs [*sic*; the district court never entered any such judgment, further demonstrating ACS's inattention to detail] should be set aside." DE23-1 at 2. Just as in *Consolidated Masonry & Fireproofing*, ACS attached neither a molecule of evidence nor a proposed answer, but chose instead to rely on conclusory assertions and self-serving opinions. As a matter of law, ACS put on no meritorious defense.

The district court cited *Colleton Prep. Acad., Inc. v. Hoover Universal*, 616 F.3d 413 (4th Cir. 2010), which ended favorably for the defense, but for one thing, the facts were vastly different. There, the defendant's registered agent, a third party, "negligently failed to forward the suitpapers or otherwise to notify [the

defendant] of the existence of the lawsuit."   616 F.3d at 415.   Here, ACS's registered agent was not a detached neutral outsider, but the very owner of ACS (Q: "The registered agent is Harry W. Scott, Jr.  What's Mr. Scott's position there? A: He's the owner."  JA177), who received process at ACS's home office.

Moreover, *Consolidated Masonry & Fireproofing* is older and must prevail. "[W]e have made it clear that, as to conflicts between panel opinions, application of the basic rule that one panel cannot overrule another requires a panel to follow the earlier of the conflicting opinions.  *See Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir. 2003)."  *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (*en banc*).

Procedurally, ACS's affirmative defenses were barred because they appeared only in affidavits, not in an answer to the Complaint.  "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one as required."  Fed.R.Civ.P. 12(b).  "In responding to a pleading, a party must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party."  Fed.R.Civ.P. 8(b)(1).  Had ACS's affidavits been taken as an answer, though of course such strained constructions should be reserved for pro se litigants, then the entire Complaint was admitted because the affidavits denied nothing.  "An allegation—other than one relating to the amount of damages—is admitted if a

responsive pleading is required and the allegation is not denied." Rule 8(b)(6).

## ACS Showed No Good Cause

"The court may set aside an entry of default for good cause[.]" Fed.R.Civ.P. 55(c). Assertions of "indefinite extension" and strategic default on case after case do not, by any stretch of law or equity, constitute good cause. ACS admits to receiving service of process on 08 October 2010 and promptly passing it along to general counsel Ken Perkins on 12 October 2010. Judging from his extensive credentials piled up in 30 years of professional experience, JA97, Mr. Perkins is the very definition of "sophisticated litigant" and knows far better than to take any lawsuit lightly. Still, he waited until time was almost up to contact Counsel and request, by his account, an unlimited extension of time to reply, even though the law recognizes no such thing and Counsel would never have agreed to it. Considering his problem solved forever, Mr. Perkins did not get around to reviewing the docket in the instant case for six months. Upon finally doing so, he discovered that he was in big trouble. He should have been left there.

"When deciding whether to set aside an entry of default, a district court should consider whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic." *Colleton Prep. Acad.*, 616 F.3d at 417.

Taking these in turn:

***Whether the moving party has a meritorious defense.*** By the time ACS appeared, Plaintiffs had proved liability and damages beyond any reasonable doubt with specific documents and sworn affidavits. All ACS came up with was a conclusory list of defenses without proof. This will never do.

> In order to secure relief from entry of a default, it is well settled that a party cannot rely on a general denial of liability but must proffer specific facts supporting a meritorious defense. *Consolidated Masonry & Fireproofing, Inc. v. Wagman Construction Corp.*, 383 F.2d 249, 251-52 (4th Cir. 1967). However, in the proceedings below, the bankruptcy court found that Defendant Thomas Burch filed a "one sentence purported 'answer' denying all allegations in the Complaint," while Defendant Carl Burch filed a "rambling purported 'answer,' in substance denying generally all allegations of the Complaint." Neither of these filings is sufficient to meet the heightened pleading requirements necessary to justify relief from the entry of a default, thus supporting the bankruptcy court's findings that Defendants had not acted in good faith upon being granted conditional relief from the entry of default, but had really sought only to obfuscate and delay the proceedings.

*Dunn v. Burch (In re Burch Co.)*, Nos. 3:05-cv-00240, 04-03236, 2006 U.S. Dist. LEXIS 81193 *7-8 (W.D.N.C. Nov. 6, 2006), *aff'd sub nom. Burch v. Dunn*, No. 06-2293, 2007 U.S. App. LEXIS 12890 *1 (4th Cir. Jun. 4, 2007): "We have reviewed the record and find no abuse of discretion and no reversible error. Accordingly, we affirm for the reasons stated by the district court."

Even generously construing the affidavits, the relevant portions read: "ACS also claims defenses of bona fide error under the FDCPA, contributory negligence by Plaintiffs, and failure to mitigate damages by Plaintiffs, among other standard

defenses." JA98, 100. There are no such things as "standard defenses" because any defense must be pleaded and proved according to the evidence in a specific case, not spewed forth in a laundry list copied from a formbook. To prove bona fide error per 15 U.S.C. § 1692k(c), ACS should have attached training materials, procedure manuals, investigative guidelines, compliance memoranda, and records pertinent to Mrs. Mavilla's alleged debts, all showing that ACS gave FDCPA the old college try, and all of which could have been filed under seal as reasonably necessary to preserve trade secrets and personal identifiers.

As for mitigation of damages, the Mavillas' affidavits and documents showed that they did everything possible to mitigate their damages in the face of ACS's obstinate refusal to correct Mrs. Mavilla's credit reports. As for contributory negligence, such "is no defense to an intentional tort." *Jenkins v. NCDMV*, 244 N.C. 560, 564, 94 S.E.2d 577, 581 (1956). Even if it were, ACS presented no evidence of contributory negligence, nor did the Mavillas seek to recover for negligence other than as a fallback from deliberate failure to investigate credit disputes per 15 U.S.C. § 1681s-2(b). ACS correctly notes that *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) requires a proffer of evidence, but ACS proffered no such evidence. There is a vast difference between a minimal showing of meritorious defense, which is what the successful defendants in ACS's cited authority did, and not showing a

meritorious defense at all.

     ***Whether it acts with reasonable promptness.***  The only promptness was occasioned by Mr. Perkins's check of the PACER docket about five months later than he should have.  This is reminiscent of *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403 (4th Cir. 2010), where plaintiff's counsel received notice of the deadline for dispositive motions and the defense timely filed for summary judgment, which the district court granted four months later after plaintiff's counsel never filed a response despite CM/ECF records proving electronic service upon him.  *See id.* at 405-06.  At last, plaintiff's counsel moved for rehearing per Rule 59(e), pleading assorted computer problems that prevented his firm from receiving emails including those from CM/ECF, but also revealing that he had done nothing to learn the status of his case before entry of judgment against his client.  "Instead, Appellant's counsel strategically chose not to call opposing counsel after the deadline for filing dispositive motions had passed because he did not want to alert them to the court's deadline.  More amazingly, he chose not to check with the district court either.  In other words, Appellant's counsel made the affirmative decision to remain in the dark."  *Id.* at 409.  Granted, this Court declined to "sponsor and apply a general duty to monitor dockets."  *Id.* at 410.  This is not the same.  Mr. Perkins knew of the deadline, but while the Mavillas worked diligently for months, he chose to take his ease, counting on the infinite

mercy of the district court to bail him out.  This behavior must not be rewarded.

If anything, ACS should have taken a few days to sharpen its aim before firing its only bullet.  Like the overanxious father-to-be who races to the hospital at 100mph only to discover upon arrival that he has left his wife back at the house, ACS's motion to set aside default, even after amendment of its supporting memorandum (DE26), did not incorporate a Rule 12(b) motion to dismiss or carry as an attachment any proposed answer to the only six-page 43-paragraph Complaint.  ACS attempts to plead affirmative defenses by affidavit, which is not the right place for affirmative defenses.  If ACS were pro se, their affidavits might be construed as responsive pleadings, but sophisticated corporations are not allowed that luxury.

*The personal responsibility of the defaulting party.*  As noted, owner Harry W. Scott, Jr. received service and delivered it to company general counsel Ken Perkins.  That is as "personal" as it gets for a corporation; there was not even any outside counsel in the loop to blame.  This case is a lot closer to *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894 (4th Cir. 1987)  than *Colleton Prep*.  In *Park*, the defendant insurance company pleaded excusable neglect in that the summons and complaint, though validly served by certified mail, never made it out of the company mailroom.  Without more, default judgment could not be set aside even though the insurance company had a meritorious defense.  *See id.* at 897.

Furthermore, "attorney inattentiveness to litigation is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant[.]"  *Robinson*, 599 F.3d at 413, *quoting Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004).  Under Rules 59(e) and 60(b) at least, plaintiff Robinson was out of luck, and there is no reason to apply different standards to Rule 55(c) and ACS.

ACS cites *United States v. Moradi*, 673 F.2d 725, 728 (4th Cir. 1982) for the proposition "that a blameless party not be disadvantaged by the errors or neglect of his attorney which cause a final, involuntary termination of proceedings."  *See also Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 811-12 (4th Cir. 1988)  ACS cannot use this because it is not blameless.  ACS's owner received process and passed it to ACS's general counsel, not an insurance company or outside firm.

***The prejudice to the party.***  This is not always easy to show, for "delay in and of itself does not constitute prejudice to the opposing party.  ... Moreover, as obvious as it may be, it bears mention that no cognizable prejudice inheres in requiring a plaintiff *to prove* a defendant's liability, a burden every plaintiff assumes in every civil action filed in every federal court."  *Colleton Prep*, 616 F.3d at 418, 419.  By the time ACS appeared, the Mavillas already had proven their case with sworn affidavits, documents, and government publications, neutralizing

*Augusta Fiberglass Coating*'s concern that the result at trial could "be contrary to the result achieved by the default."  843 F.3d at 812, *quoting Williams v. Blitz*, 226 F.2d 463 (4th Cir. 1955).  The difference here is that, in the reasonable expectation of prompt default judgment, the Mavillas chose to drop WakeMed without prejudice so as to speed things up.  In so doing, the Mavillas relinquished the considerable advantage of another source of funds for recovery and a very effective cause of action, the North Carolina Debt Collection Act, Count II of their Complaint, JA18, that appears to be cumulative to those pleaded against ACS.  Months later, the district court pulled the rug out from under them.  This was completely unfair to the Mavillas, who had obeyed every rule and order in full and on or ahead of time.

**Whether there is a history of dilatory action.**  Indeed there is.  As seen in JA67-72, 91, and 104-13, ACS has been sued numerous times for fair debt collection violations and has simply ignored most of them, allowing itself to be defaulted.  On at least one occasion, ACS agreed to settle the matter, then refused not only to pay the plaintiff but even to return counsel's communications or draft the settlement agreement.  JA111-13**.**  Mr. Perkins and Mr. Malmfelt both claimed that these defaults are on purpose, to "minimize damages" and save attorney fees.  It is common sense that defaulting is most certainly *not* a way to *minimize* damages.  If nothing else, ACS should have tendered statutory and actual damages

immediately after service of process, depriving the trial courts of jurisdiction and *really* saving attorney fees.  Also, this factor does not distinguish between dilatory conduct in the instant court or in other courts, and so it was error for the district court to brush aside ACS's deliberate defaults only because "[n]o history of default has been demonstrated in this court."  JA129.

  ***The availability of sanctions less drastic.***  The Mavillas can think of none that would suitably address ACS's persistent disdain for the rule of law.  $3,500 in attorney fees, a drop in ACS's revenue bucket, would have no appreciable effect.  Especially given that it came up with no hint of a meritorious defense, ACS is overdue for a sharp lesson in respect for the rights and property of others, in the form of a hefty judgment enforced by lien, levy, and sale of its property,

  This Court must reverse the district court and order the default reinstated, or there will be no more Rule 55 left.

## 2. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR ACS AND DENYING PLAINTIFFS' PARTIAL SUMMARY JUDGMENT MOTION ON ALL FDCPA CLAIMS.

### Standard of Review

  "We review an award of summary judgment de novo.  *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003).  Summary judgment is only appropriate 'if the pleadings, the discovery and disclosure materials on file,

and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'  Fed.R.Civ.P. 56(a). We construe the evidence in the light most favorable to Adams, the party opposing the Defendants' summary judgment motion, and draw all reasonable inferences in his favor.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (*en banc*)."  *Adams v. Trs. of the Univ. of N.C.- Wilmington*, 640 F.3d 550, 556 (4th Cir. 2011).

**Strict Liability is the Law of the Fourth Circuit**

This Court's clear and implacable precedent correctly recognizes FDCPA as a strict liability statute that protects consumers, not collectors.  ACS disregarded Mrs. Mavilla's proof that she owed nothing and continued attempting to collect, and actually collected, money that Mrs. Mavilla did not owe.  Then ACS admitted, on the same evidence that it had before, that Mrs. Mavilla never owed anything. Unbelievably, the district court exonerated ACS of all responsibility for its months of senseless harassment on grounds that ACS was only repeating what WakeMed told it, even though WakeMed could not have had any better information than ACS.  This was gross error, to the point that the Mavillas do not see how ACS can ethically contest this issue any longer.

Nobody below disputed that FDCPA governs collection of the alleged debts, medical services being patently "for personal, family, or household purposes," and

"any obligation or alleged obligation of a consumer to pay money" for them is a covered "debt."  15 U.S.C. § 1692a(4).  "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  Nobody disputed that ACS is a covered "debt collector."  ACS was therefore supposed to have complied with FDCPA in all of its dealings with the Mavillas.  It refused to do so.

ACS attempted to collect debts that the Mavillas never owed by misrepresenting to them that they owed these debts and then misrepresenting to the credit bureaus that they owed these debts.  This violated 15 U.S.C. § 1692e(2)(A), (5), and (10), as the Mavillas expressly alleged in paragraph 21 of their complaint. JA16.  The district court correctly noted that the Mavillas "rely heavily on the strict liability nature of the law, *see* Plaintiffs' Memorandum in Support (DE59), p. 15-17 (quoting *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 375 (4th Cir. 2012))[.]"  JA342.  The district court then repeated the error that it committed in *Warren*, wrongly throwing the burden of proof, and risk of harm, on the Mavillas.

> The statute itself contains no scienter requirement. Rather, it imposes liability on "any debt collector who fails to comply with any provision" of the Act. 15 U.S.C. § 1692k(a); *see also id.* § 1692k(b) (directing courts to consider whether the "debt collector's noncompliance was intentional" in assessing "the *amount* of liability" (emphasis added)). In other words, as a number of our sister circuits have held, the FDCPA "imposes liability without proof of an

intential violation." *See Allen ex rel. Martin v. LaSalle Bank, N.A.,* 629 F.3d 364, 368 (3d Cir. 2011); *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010); *Donohue* [*v. Quick Collect, Inc.*], 592 F.3d [1027,] 1030 [9th Cir. 2010]; *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010);   [*22] *Ruth v. Triumph P'ships*, 577 F.3d 790, 805 (7th Cir. 2009).

*Warren*, 676 F.3d at 375. And this was not the first opinion to hold that the collector, not the consumer, bears the risk of error in this Circuit.

> In the alternative, W&A argues that it should not be held liable for the statements in the summary judgment motion, because it reasonably relied upon the affidavit of its client for those statements.  The district court agreed with W&A and noted this circumstance as an alternative ground for dismissing Sayyed's claims relating to the summary judgment motion. The court stated, "[T]he fact that the lawyer . . . relies on the client's representation and then makes the statement in my view would be another reason why the lawyer could not be individually liable under the act." J.A. at 82-83.

> In this, the district court was in error. The district court treated W&A's alleged reliance as another reason to dismiss for failure to state a claim, but its proper role is as a defense against legally cognizable claims under the FDCPA.  It is uncontestable that the FDCPA creates a cause of action against attorneys who act as debt collectors for their false statements about the debt. The Act also provides the *exclusive* method of considering whether the attorney's false statements were the product of reasonable reliance upon another party: the bona fide error defense of § 1692k(c).

*Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 235 (4th Cir. 2007).

## Collecting Stale Debt Requires Disclosure of Staleness

As to collection of a time-barred debt, the district court claimed, DE82 at 22:

"The Mavillas allege in the Complaint that ACS violated subsection e(5) by threatening to bring civil lawsuits against them to collect the fake debt beyond

expiration of the statute of limitations. See Complaint [DE-1] ¶ 16." This is plainly untrue, as that paragraph reads in full: "Even if these were valid debts, the statute of limitations on consumer debt is three years from the date of last activity per NCGS § 1-52(1)." The only explanation for the district court's misstatement is that it simply copied ACS's words from its summary judgment memorandum, DE62 at 5: "In her complaint, Mrs. Mavilla alleged that ACS threatened civil suits to collect this debt beyond the statute of limitations. (Comp. ¶ 16)." That the district court chose to believe ACS, even though no reasonable reading of the paragraph in question would support such an inference, is another disappointing and disturbing example of its undue sympathy for ACS.

Here, the Mavillas did not even attempt to argue a blanket ban on collection of stale debt from 15 U.S.C. § 1692f. The problem is collecting it without disclosing important information that people should know before making such an important decision. It seems to the Mavillas that FDCPA would consider violation of state law to be unfair or unconscionable. As it happens, that is just the case in North Carolina. "Seeking or obtaining any written statement or acknowledgment in any form containing ... an acknowledgement of any debt barred by the statute of limitations [three years; *see* NCGS § 1-52(1)] ... without disclosing the nature and consequences of such affirmation or waiver and the fact that the consumer is not legally obligated to make such affirmation or waiver" violates § 58-70-115(1).

"Where suit is brought more than three years after the claim arises on an account or other contractual debt, the bar of the statute of limitations may be avoided if the debtor has acknowledged his obligation within three years prior to the date the action is filed." *Whitley's Electric Svc., Inc. v. Sherrod*, 293 N.C. 498, 505, 238 S.E.2d 607, 612 (1977). ACS never disclosed this important information.

**ACS Deliberately Re-Aged the False Debts**

Besides the prohibition of "false representation of the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), and "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," § 1692e(10), FDCPA specifically forbids: "Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." § 1692e(8). All such information that ACS reported was false, as it now admits, violating e(8).

The district court not appear to deal with another aspect of this violation: When it reported the false debts on Mrs. Mavilla's credit reports, ACS altered the dates of last activity to make them look more recent. JA49-51 shows dates of "4/2009" for services that WakeMed (never) performed in June 2005 and July 2006 according to JA30-32, meaning that ACS and only ACS misreported these dates to make them look more recent. This plainly violated 15 U.S.C. § 1692e(8).

**ACS Cannot Prove its Pleaded Affirmative Defenses**

Though the district court did not cover ACS's purported affirmative defenses, discussing them will help to show the difference between this concept and that of FDCPA strict liability in their absence. ACS never followed up on its Third Affirmative Defense of failure to state a claim with a specific motion and memorandum per Fed.R.Civ.P. 12(b)(6), leaving it with only its Answer's Second Defense of bona fide error, presumably referring to 15 U.S.C. § 1692k(c): "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

ACS has produced no documents proving such "maintenance" and has not specified which FDCPA provisions are taught in its alleged compliance program. Mr. Malmfelt's reference to generic FDCPA initial training and refreshers, or to keeping up with ACA (American Collectors Association International, an industry lobbying group that bills itself as "The Association of Credit and Collection Professionals") materials, JA176, without a clue as to what is in those materials and in what format they appear, or which of the many FDCPA common or uncommon errors they cover, does not begin to carry ACS's burden of proof.

SCOTUS holds only factual errors to qualify for this treatment; "the bona

fide error defense of § 1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, __ (2010)  Furthermore, by the statute's plain language, only "not intentional" transgressions may be bona fide errors.  All evidence indicates that ACS does not care whether its clients' accounts are accurate, and will collect absolutely anything its clients tell it to without question.  ACS deliberately chose not only to collect on plainly time-barred debts that it knew Plaintiffs did not owe, but also chose to "re-age" them, collection industry parlance for fraudulently altering dates of last activity to April 2009, instead of the "correct" dates of July 2005 or 2006, to cause even more credit damage.  JA49-51.

As far as can be told, ACS believes its only obligation to be following creditors' orders, not fair debt collection law.  When asked repeatedly about the matter, Mr. Malmfelt, both on his own and as a representative of ACS, testified that there are no procedures to prevent or correct errors at ACS, and that ACS always believes everything its clients tell it without question, regardless of the actual amount, nature, or status of any debt. JA182-83.

```
12    Q:   How can you prove that Mrs. Mavilla ever owed
13   these debts and that these services were ever performed?
14          MR. PARTRICK:  Object to the form.
15    A:   The first question, the account was first
16   electronically placed with us by WakeMed.  That's our
17   first basis that the debt was for Mrs. Mavilla.
```

18  Subsequently, we also received an itemized bill from
19  WakeMed that listed the charge as being for Mrs. Mavilla.
20  So that's two times that WakeMed proved to us that the
21  charges belonged to Mrs. Mavilla.
22      Q:   And so that's all the proof you need, is an
23  account statement like this?
24          MR. PARTRICK:  Object to the form.  You
25  can answer.
 1      A:   WakeMed provided those charges as for Mrs.
 2  Mavilla, and it's our responsibility to attempt to
 3  collect on those charges.
...
[page 34]
 8      Q:   So there's no way, then, of once you get an
 9  itemized bill from WakeMed, there's no way ever that a
10  consumer can ever prove that it's not theirs and to get
11  you to stop collecting it?
12          MR. PARTRICK:  Object to the form.
13      A:   That's a pretty vague question.  Again, in
14  this case and what I know of this case, we had two
15  occasions where WakeMed confirmed that the charges were
16  for Mrs. Mavilla, the placement of that account and the
17  itemized bill for that account.

In other words, Mr. Malmfelt could not name any circumstances under which ACS

will stop collecting even if it receives indisputable direct evidence disproving any

debt, and even if ACS were inclined to do so, it will first ask WakeMed about it,

who will then assure ACS that the debt is valid and owing, and ACS will then

unreasonably and obstinately disregard conclusive evidence to the contrary and

keep collecting on blind faith—exactly as it did to the Mavillas.

JA211-214, though, shows that ACS's clients frequently and ludicrously err,

and Stan Iradi knows it through BBB reports, such as dunning a servicemember

whose orders proved them to be in Japan on the dates of alleged emergency room visits. Mr. Iradi's testimony at ACS's deposition should, upon closer examination, show that he is the one who answers these BBB complaints and knows full well that ACS's clients are far from infallible. Yet ACS continues to act as though they are. It must therefore pay for those occasions on which its blind faith fails.

At most, ACS's pleas of good faith error supported submission to the jury instead of immediate summary judgment in its favor. For example, from *Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383, 392-93 (D.Del. 1991):

> The court finds that debt collectors may be found in violation of subsection 1692e(2)(A) for mistakenly dunning the wrong individuals when they fail to exercise reasonable care in ascertaining the facts, such as by relying upon information on which a reasonable person would not have relied.
> Generally, a debt collector may reasonably rely upon information provided by a creditor who has provided accurate information in the past. *See generally Howe v. Reader's Digest Ass'n, Inc.*, 686 F. Supp. 461, 467 (S.D.N.Y. 1988). Whether defendants reasonably relied on the information supplied by Wilmington Orthopedics is a question of fact for trial. Likewise, whether it was reasonable for defendants to rely upon the statement of Frank Beattie [*393] that the debt was owed by his son is a factual question that must be decided at trial. The cross-motions for summary judgment will therefore be denied on the issue of whether defendants violated 15 U.S.C.A. § 1692e(2)(A).

Unlike the plaintiffs in *Beattie*, Plaintiffs *have* "alleged that defendants engaged in persistent and continuing demand of payment accompanied by increasingly harsh threats," *id.* at 394, which ACS can scarcely deny, violating 15 U.S.C. § 1692d.

ACS could have more completely treated some of its cited cases. "Logically, if a debt collector reasonably relies on the debt reported by the creditor,

the debt collector will not be liable for any errors."  ACS quoted only that much of

*Clark v. Capital Credit & Collection Svcs., Inc.*, 462 F.3d 1162, 1177 (9th Cir.

2006).  But right after that is: "On the other hand, the bona fide error defense will

not shield a debt collector whose reliance on the creditor's representation is

unreasonable or who represents to the consumer a debt amount that is different

from the creditor's report."  *Id.*  No sensible human could reasonably credit

WakeMed's word that Mrs. Mavilla had two or three babies over Mrs. Mavilla's

representation that she did not.

   *Clark* gave rise to *Reichert v. Nat'l Credit Sys.*, 531 F.3d 1002 (9th Cir.

2008).  Contrasting its facts with those resulting in summary judgment success for

the defendant in *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 421 (8th Cir. 2008) ("The

affidavits and supporting documents establish that Credico's employees received

specific instructions to segregate principal and interest in setting up the accounts

received from Pinnacle so as to avoid charging interest on interest."), the Ninth

Circuit soundly rebuked the errant collector and not only denied it summary

judgment, but also affirmed summary judgment for its victim.

   NCS concedes that the attorney's fee was not authorized by the lease
agreement or permitted under Arizona  [**9] law, but nevertheless contends
that it should escape liability. First, it argues that the creditor's submission of
accurate information in the past allowed NCS to rely on the creditor's
representations in this case. Urging that this reliance was reasonable, it points
to this court's statement in *Clark* that "[l]ogically, if a debt collector
reasonably relies on the debt reported by the creditor,  [*1007]  the debt
collector will not be liable for any errors." 460 F.3d at 1177. Alternatively,

NCS contends that its manager's affidavit satisfied the "procedures" requirement of the statutory bona fide error defense.

**The fact that the creditor provided accurate information in the past cannot, in and of itself, establish that reliance in the present case was reasonable and act as a substitute for the maintenance of adequate procedures to avoid future mistakes.** The declaration submitted by NCS said only that the creditor "has never previously given NCS incorrect information." The fact that the creditor had not made errors in calculating amounts due does not speak to the problem here, the addition of the attorney's fee. NCS did not give reason to justify its reliance on the creditor for the erroneous [**10] premise that the attorney's fee could properly be added. As a result, NCS failed to carry its burden of establishing that its reliance upon the creditor was reasonable.

When we spoke in *Clark* of the nonliability of a debt collector who "reasonably relies" on the reported debt, we were referring to a reliance on the basis of procedures maintained to avoid mistakes. **A debt collector is not entitled under the FDCPA to sit back and wait until a creditor makes a mistake and then institute procedures to prevent a recurrence.** To qualify for the bona fide error defense under the FDCPA, the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors, including, but not limited to, errors in calculation and itemization. The latter would include errors in claiming collection expenses of the creditor that could not legitimately be part of the debt owed by the debtor.

If the bona fide error defense is to have any meaning in the context of a strict liability statute, then a showing of "procedures reasonably adapted to avoid any such error" must require **more than a mere assertion to that effect. The procedures themselves must be explained,** along with the [**11] manner in which they were adapted to avoid the error. *See Wilhelm*, 519 F.3d at 421. Only then is the mistake entitled to be treated as one made in good faith. Because NCS submitted **only a conclusory declaration** stating that it maintained procedures, we hold that it **failed to establish a bona fide error defense** under the FDCPA.

[Summary judgment for consumer] AFFIRMED.

531 F.3d at 1006-07 (emphasis supplied).  *Reichert* at 1006 cites *Jenkins v. Heintz*,

124 F.3d 824, 834 (7th Cir. 1997) for an example of what *will* show satisfactory

procedures.

> These include the publication of an in-house fair debt compliance manual, updated regularly and supplied to each firm employee; training seminars for firm employees collecting consumer debts; and an eight-step, highly detailed pre-litigation review process to ensure accuracy and to review the work of firm employees to avoid violating the Act. After suit is filed, the firm assigns an attorney to review all issues relating to a particular deficiency, and stops all collection efforts on a disputed balance before judgment to verify all disputed items with the client. ... They go so far as to insist that their client verify under oath that each of the charges was true and correct.

ACS is not *Jenkins*; it is *Reichert*, choosing to buy a pig in a poke every time it accepts an account from WakeMed, not caring a whit whether the easily faked invoices are accurate. Never did ACS or any other witness testify as to how ACS assured itself of the soundness and reliability of *WakeMed's* procedures and policies for originating bills, attributing them to the correct patients, and keeping correct balances. ACS, in fact, knew the opposite to be true. The angry BBB complaints, JA211-14, which Stan Iradi answered, put ACS on plenty of notice that WakeMed bills are simply not to be believed.

**Damages**

ACS's conduct and communications were false and deceptive from the get-go, meriting maximum financial pain in return. No reasonable jury could award less than $1,000 on such evidence. Tragically, FDCPA's maximum statutory damage limit of $1,000 per plaintiff per defendant results in only another $2,000 for the Mavillas over and above their actual damages. These total $80,589; the $180 that Plaintiffs paid to ACS and the $80,409 unnecessary interest over the life

of Plaintiffs' home mortgage. According to standard mortgage calculation software, a 3.5% refinance would have lowered the Mavillas' monthly payment to $1,057.94 before escrow, a savings of $268.03 per month, totaling $80,409.00 over the 300-month term. JA79, 81.

The district court must be reversed and the cause remanded with directions to enter summary judgment for the Mavillas on their FDCPA claims in the amount of $82,409 plus costs and attorney fees.

## 3. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR ACS AND DENYING PLAINTIFFS' SUMMARY JUDGMENT MOTION ON PLAINTIFFS' FCRA CLAIMS.

### Standard of Review

"We review an award of summary judgment de novo. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is only appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' Fed.R.Civ.P. 56(a). We construe the evidence in the light most favorable to Adams, the party opposing the Defendants' summary judgment motion, and draw all reasonable inferences in his favor. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (*en banc*)." *Adams v. Trs. of the Univ. of N.C.- Wilmington*, 640 F.3d

550, 556 (4th Cir. 2011).

## FCRA Investigation Is No Simple Matter

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). To this end, FCRA authorizes actual and statutory damages for failure to conduct a reasonable investigation of a properly submitted dispute, and punitive damages for intentional violations. What furnishers are supposed to do per 15 U.S.C. § 1681s-2(b) is:

(b) Duties of furnishers of information upon notice of dispute.

(1) In general. After receiving notice pursuant to section 611(a)(2) [15 USCS § 1681i(a)(2)] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [15 USCS § 1681i(a)(2)];

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

ACS did none of these things, even though any reasonable investigation would

have shown Mrs. Mavilla's alleged debts to have been biologically impossible. ACS admits that it does nothing to verify credit information before its computer system damages or destroys consumers' credit.  JA183.  This drops ACS into a kettle of very hot FCRA water.

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed. 2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It [**8] would make little sense to conclude that, in [*431] creating a system intended to give consumers a means to dispute - and, ultimately, correct - inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, *unreasonable* inquiries by creditors. *Cf. Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991) (interpreting analogous statute governing reinvestigations of consumer disputes by credit reporting agencies to require reasonable investigations); *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (same). We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified.

*Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 430-31 (4th Cir. 2004).  In that case, MBNA negligently failed to investigate the consumer's dispute on the entirely correct grounds that she was only an authorized user, not an obligor, and the Fourth Circuit affirmed the jury's award of $90,300 actual damages per 15 U.S.C. § 1681o.  *See id.* at 432-33.  Later, Equifax dawdled over an identity theft victim's disputes for 21 months, causing credit turndowns and severe marital

problems, earning $106,000 economic damages and $150,000 mental and emotional damages—*after* a thoroughly reasoned remittitur. *See Sloane v. Equifax Info. Svcs., LLC*, 510 F.3d 495, 502-507 (4th Cir. 2007).

Not having learned from the experience, Equifax yet again bungled an identity theft victim's dispute for years on end, causing her all manner of ills, including dramatically disadvantageous mortgage terms, resulting in a $200,000 actual damages award. *See Robinson v. Equifax Info. Svcs., LLC*, 560 F.3d 235, 238-39, 242-43 (4th Cir. 2009). It seems that it is more profitable for FCRA's target audience to disregard the law and pay the occasional six-figure judgment than to make the effort to get vital information right.

**FCRA Gives No 30-Day Safe Harbor**

As to the date of dispute, the Order appealed from claims, JA322, that "the court has not been able to locate documentation of that date within the record." But JA203, 206, and 208 is plain (allcaps in original): "9/27/10 – Vickie Garrett – RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED; PAID." The district court further ruled: "The Mavillas have identified no evidence that the notifying CRA supplied any information other than what appeared in its electronic notification via E-OSCAR." JA336. Common sense says that the Mavillas disputed the entire pack of untruths that defaced Mrs. Mavilla's credit reports, since that is what ACS "investigated" and "verified."

Equifax's response to her dispute shows expressly that Mrs. Mavilla said that the debts were not hers. "We have researched the collection account. Account # [redacted]  The results are: Equifax verified that this item belongs to you.  If you have additional questions about this item please contact: Absolute Collection Service, Raleigh, 421 Fayetteville Street Mall S, Raleigh NC 27601-1792." JA62-63.There was nothing about those tradelines that was *not* disputable.

The district court insisted that ACS was entitled to 30 days before suit, even if on the same day it got the dispute it had done all the investigating it was ever going to do.  15 U.S.C. § 1681s-2(b)(2): "Deadline.  A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under 15 U.S.C. § 1681i(a)(1) within which the consumer reporting agency is required to compete actions required by that section regarding that information."  § 1681i(1) in turn requires, in pertinent part, that

> if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

ACS did, or pretended to do, an investigation "before the end of the 30-day period"

that should have proved the falsity of the debt. Over a year later, when ACS, having at last obtained "permission" from WakeMed to do so, admitted that the debts were false, this was based entirely on the same evidence that it had at the time of "investigation." Giving it another 25 days would have been futile and is not what the statute requires. Whatever non-binding caselaw the district court may or may not have cited, neither binding precedent nor common sense gives furnishers of information a 30-day window during which they are free to leave admittedly false information on innocent people's credit reports without penalty. JA183 has been detailed before, and in it, Mr. Malmfelt admits that ACS has no policy or procedure for human intervention or investigation of tradelines. FCRA does not excuse such premeditated carelessness.

## Damages

FCRA entitles the Mavillas to actual damages at the very least, even if ACS was no more than negligent. "Any person who is negligent in failing to comply with any requirement imposed under this subchapter [III, which comprises the Fair Credit Reporting Act] with respect to any consumer is liable to that consumer in an amount equal to the sum of (1) any actual damages sustained by the consumer as a result of the failure[.]" 15 U.S.C. § 1681o(a)(1). Plaintiffs would have qualified for a 3.5% 25-year mortgage, which would have lowered their payments by $268.03 per month, totaling $80,409 over the 300-month term. JA79, 81.

Plaintiffs were going for a 3.5% 25-year mortgage and but for ACS's failure to investigate their dispute per 15 U.S.C. § 1681s-2(b) would have had above-average credit and could have successfully reapplied for refinancing.  The district court made much of the fact that the Mavillas had not yet reapplied, but with the false tradelines still there, this would have been futile.

Intentional failure to comply with § 1681s-2(b) deserves at least statutory damages, and carries the distinct possibility of punitive damages.  *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 152-55 (4th Cir. 2008) easily affirmed an $80,000 punitive award on top of only $1,000 *statutory*—not actual—damages for the creditor's refusal to report a disputed debt as disputed.  Here, Plaintiffs suffered actual damages in the form of Mrs. Mavilla's severely reduced credit scores that stuck both her and Mr. Mavilla with their old high-interest mortgage.  From its own records, ACS could easily have seen at the very least that the tradelines had been re-aged to April 2009 instead of their alleged original dates of (no) service.  JA49-51.  Per 15 U.S.C. § 1681n(a), Plaintiffs are entitled to actual damages or maximum $1,000, plus whatever punitive damages are necessary to punish ACS and deter other actors.  Given ACS's obstinate refusal to concede the obvious in a post-*Saunders* compliance environment, this award should be steep.

## 4. THE DISTRICT COURT MUST DECIDE PLAINTIFFS' STATE LAW CLAIMS UPON REMAND.

## Standard of Review

The standard of review for decisions as to supplemental jurisdiction is abuse of discretion. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). The state claims were not so "closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." *Id.* at 727. Though 28 U.S.C. § 1367(a) has since codified the common law doctrine of pendent jurisdiction, § 1367(c) echoes *Gibbs*' concerns. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—(1) the claim raises a novel or complex issue of State law ... [or] (3) the district court has dismissed all claims over which it has original jurisdiction[.]" This is the normal choice for the ever-overloaded federal courts, especially at the preanswer motion stage when investment in the case is small. *See*, *e.g.*, *Mora v. City of Gaithersburg*, 519 F.3d 216, 231 (4th Cir. 2008) ("Thus, taking his claim as one of state law, we decline to exercise supplemental jurisdiction."); *Jenkins v. Medford*, 119 F.3d 1156, 1165 (4th Cir. 1997) ("We reverse the ruling of the district court and hold the deputies failed to state a claim.

... In the absence of a federal action, the deputies' claim under state law should also be dismissed."); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers*, 18 F.3d 1161, 1166 (4th Cir. 1994) ("Inasmuch as the district court properly dismissed all federal claims, it did not err by dismissing New Beckley's pendent state law claims.").

**The District Court Must Decide the State Claims On Remand**

Though the district court was within its discretion to dismiss the Mavillas' state law claims without prejudice after (erroneously) terminating all federal claims, it must reinstate and rule on them upon remand, since there will be live federal questions from which to hang pendent state law claims. Since there was no decision on any state issues, this Court and the parties have nothing to work from. Neither was there any finding of novelty, complexity, or comity that would render federal supplemental jurisdiction inappropriate. The Mavillas hereby preserve all of their state law claims for consideration in the first instance upon remand.

## <u>CONCLUSION</u>

WHEREFORE Plaintiffs-Appellants request that this Court reverse the district court's setting aside default and remand with instructions to reinstate said default and enter default judgment in their favor against Defendant-Appellee; or in the alternative to reverse both the district court's grant of ACS's summary judgment motion and its denial of Plaintiffs' summary judgment motion and remand with instructions to enter judgment on liability, actual damages, and full statutory damages in Plaintiffs' favor on all federal claims, with punitive damages to be tried by jury; or in the alternative to reverse the district court's grant of ACS's summary judgment motion and remand for jury trial of all issues so triable; and consideration in the first instance of Plaintiffs state law claims.

## **<u>SIGNATURE OF COUNSEL</u>**

Submitted this **29 April 2013** by

__s/ Christopher W. Livingston_____
Chris Livingston Attorney at Law
PO Box 220, White Oak NC 28399
Phone 910 876 7001, fax 910 866 5297
Email chrisatty@hotmail.com
State Bar No. 27282

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 13-1170          **Caption:** Mavilla v. Absolute Collection Service, Inc.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑ this brief contains _____13,898_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using
MS Word 2007 _____ [*identify word processing program*] in
14-point Times New Roman _____ [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Christopher W. Livingston _____

Attorney for Plaintiffs-Appellants _____

Dated: 29 April 2013 _____

## <u>CERTIFICATE OF SERVICE</u>

I certify that on **29 April 2013** I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users, and further served the required numbers of paper copies of the Opening Brief and Joint Appendix by U.S. Mail, first class postage prepaid, no later than **30 April 2013** upon:

For Appellee Absolute Collection Service, Inc. n/k/a FKAACS, Inc.:

Sean T. Partrick, Esq.
Yates, McLamb & Weyher, L.L.P.
PO Box 2889
Raleigh NC 27602-2889
Phone 919 835 0900, fax 919 835 0910
Email spartrick@ymwlaw.com