RECORD NO. 13-1170

In The

# United States Court of Appeals
## For The Fourth Circuit

## NARENDRA MAVILLA; PADMAVATHI MAVILLA,

*Plaintiffs – Appellants*,

**v.**

## ABSOLUTE COLLECTION SERVICE, INC.,

*Defendant – Appellee*,

**and**

## WAKEMED FACULTY PHYSICIANS,

*Defendant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## AT RALEIGH

_____

## BRIEF OF APPELLEE

_____

Sean T. Partrick
Jennifer D. Maldonado
Allison J. Becker
YATES, McLAMB & WEYHER, LLP
Post Office Box 2889
Raleigh, North Carolina  27602
(919) 835-0900

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1170__    Caption: __Mavillia v. Absolute Collection Service, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Absolute Collection Service, Incorporated who formally changed its name to FKAACS, Inc__
(name of party/amicus)

__as of June 29, 2012.__

who is _____appellee_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Sean T. Partrick _____    Date: _____2/14/2013_____

Counsel for: Appellee _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____2/14/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Sean T. Partrick _____          _____2/14/2013_____
        (signature)                                      (date)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..........................................................................iv

STATEMENT OF THE CASE.......................................................................1

STATEMENT OF THE FACTS ....................................................................5

SUMMARY OF THE ARGUMENT ...........................................................11

ARGUMENT ..............................................................................................13

I.    THE DISTRICT COURT PROPERLY SET ASIDE THE
      ENTRY OF DEFAULT ....................................................................13

      A.    Standard of review ..................................................................13

      B.    Plaintiffs' argument that the District Court violated its
            own rules in setting aside the default judgment is wholly
            without merit ...........................................................................15

      C.    ACS demonstrated good cause to set aside the Entry of
            Default......................................................................................17

            1.    ACS established the presence of a meritorious
                  defense ..........................................................................17

            2.    ACS acted with reasonable promptness in filing
                  the Motion to Set Aside ................................................19

            3.    ACS was not personally responsible for the delay.........20

            4.    ACS has no history of dilatory behavior ........................23

            5.    Plaintiffs have admitted that sanctions less drastic
                  were available and that they would suffer no
                  prejudice if the Entry of Default were set aside .............24

i

II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR ACS ON ALL FDCPA CLAIMS ............................................................. 25

    A.    Standard of review .................................................. 25

    B.    There is no genuine issue of material fact as to the Plaintiffs' claims under §§ 1692e(2)(A) and (10), because it is undisputed that the accounting error was WakeMed's, and ACS was entitled to rely on the creditor to provide accurate account information ................................. 26

    C.    ACS did not violate § 1692e(5) as a matter of law, because a statute of limitations only bars filing of a civil suit to collect a debt—it does not prevent collection by other lawful means .................................................. 30

    D.    Plaintiffs never alleged any violations of § 1692e(8) in the Complaint and cannot use this appeal to do so now .......... 32

    E.    ACS was entitled to summary judgment on the § 1692f claim, because the Plaintiffs did not sufficiently allege that any such violation occurred ................................. 33

    F.    ACS was entitled to summary judgment on the FDCPA claims because any alleged misconduct was a result of a *bona fide* error under § 1692k(c) ................................ 36

III.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR ACS ON ALL FCRA CLAIMS ............................................................. 39

    A.    Standard of review .................................................. 39

    B.    There is no private right of action under § 1681s-2(a) of the FCRA for allegedly filing "false" information to a CRA.......................................................................... 39

C. The District Court properly dismissed the Plaintiffs' claims alleging a failure to conduct a reasonable investigation under § 1681s-2(b) because the Mavillas' claim was premature ...............................................................41

D. The Plaintiffs failed to demonstrate any breach of § 1681s-2(b)(1)(A) or (B) because they did not show "the relevant information" provided by the CRA that ACS allegedly failed to review...........................................................43

E. Even if the Mavillas had complied with § 1681s-2(b), the undisputed facts show that ACS still complied with the statutory requirements...............................................44

F. The Plaintiffs essentially admit that any further inquiry by ACS to WakeMed would have been futile ..........................47

G. Plaintiffs cannot prove that they suffered any damages as a result of ACS's alleged actions ...............................................47

IV. MR. MAVILLA HAS NO STANDING AS A PLAINTIFF..............50

V. BECAUSE THE FEDERAL CLAIMS WERE PROPERLY DISPOSED OF BEFORE TRIAL, THERE IS NO NEED FOR THE DISTRICT COURT TO CONSIDER THE STATE CLAIMS .............................................................................................51

CONCLUSION .....................................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    447 U.S. 242 (1986)....................................................................26, 39

*Augusta Fiberglass Coatings, Inc., v. Fodor Contracting Corp.*,
    843 F.2d 808 (4th Cir. 1988) .......................................18, 19, 21, 22

*Beattie v. D.M. Collections, Inc.*,
    754 F. Supp. 383 (D. Del. 1991) .......................................27, 28, 35

*Bleich v. Revenue Maximization Grp., Inc.*,
    233 F. Supp. 2d 496 (E.D.N.Y. 2002) ...........................................37

*Brown v. Gardner*,
    515 U.S. 115 (1994)........................................................................51

*Cahlin v. General Motors Acceptance Corp.*,
    936 F.2d 1151 (11th Cir. 1991) ....................................................48

*Carter v. Countrywide Home Loans, Inc.*,
    2009 WL 2742560 (E.D. Va. Aug. 25, 2009) .........................50, 51

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986)..................................................................25, 26

*Central Operating Co. v. Utility Workers of America*,
    491 F.2d 245 (4th Cir. 1974) ........................................................17

*Clark v. Capital Credit & Collection Servs., Inc.*,
    460 F.3d 1162 (9th Cir. 2006) ......................................................36

*Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*,
    616 F.3d 413 (4th Cir. 2010) ..................................................14, 16

iv

*Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*,
    383 F.2d 249 (4th Cir. 1967) ............................................................14, 16, 17

*Ducrest v. Alco Collections, Inc.*,
    931 F. Supp. 459 (M.D. La. 1996) ................................................................37

*Hawkspere Shipping Co. v. Intamex, S.A.*,
    330 F.3d 225 (4th Cir. 2003) ...................................................................25, 39

*Howe v. Reader's Digest Ass'n, Inc.*,
    686 F. Supp. 461 (S.D.N.Y. 1998) ................................................................27

*Jordahl v. Democratic Party of Va.*,
    122 F.3d 192 (4th Cir. 1997) .......................................................................51

*Longman v. Wachovia Bank, N.A.*,
    __ F.3d __, 2012 WL 6604538 (2d Cir. Dec. 19, 2012) ...............................40

*Nagle v. Experian Info. Solutions, Inc.*,
    297 F.3d 1305 (11th Cir. 2002) ....................................................................48

*Payne ex rel. Estate of Calzada v. Brake*,
    439 F.3d 198 (4th Cir. 1967) ...................................................................14, 19

*Poulin v. The Thomas Agency*,
    760 F. Supp. 2d 151 (D. Me. 2011) ..........................................................36, 37

*Robinson v. Wix Filtration Corp. LLC, Robinson*,
    599 F.3d 403 (4th Cir. 2010) ...................................................................21, 22

*Ruffin–Thompkins v. Experian Info. Solutions, Inc.*,
    422 F.3d 603 (7th Cir. 2005) .......................................................................48

*Russello v. United States*,
    464 U.S. 16 (1983) .......................................................................................51

*Saunders v. Branch Banking & Trust Co. of Va.*,
    526 F.3d 143 (4th Cir. 2008) .......................................................................40

*Sayyed v. Wolpoff & Abramson*,
    485 F.3d 226 (4th Cir. 2007) ...................................................................28, 29

*Seabulk Offshore, Ltd. V. Am. Home Assur. Co.*,
    377 F.3d 408 (4th Cir. 2001) ........................................................................26

*Shanaghan v. Cahill*,
    58 F.3d 106 (4th Cir. 1995) ..........................................................................51

*Shapiro v. Haenn*,
    222 F. Supp. 2d 29 (D. Me. 2002) ........................................................... 36-37

*SimmsParris v. Countrywide Fin. Corp.*,
    652 F.2d 355 (3d Cir. 2011)....................................................................40, 41

*Smith v. Transworld Systems, Inc.*,
    953 F.2d 1025 (6th Cir. 1992) .......................................................................36

*Sweitzer v. Am. Express Centurion Bank*,
    554 F. Supp. 2d 788 (S.D. Ohio 2008) ..........................................................41

*Tazco, Inc. v. Director, Office of Workers Compensation Program,*
*U.S. Dep't of Labor*,
    895 F.2d 949 (4th Cir. 1990) ..................................................................14, 16

*Tolson v. Hodge*,
    411 F.2d 123 (4th Cir. 1969) ........................................................................16

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966)......................................................................................52

*United States v. Moradi*,
    673 F.2d 725 (4th Cir. 1982) ........................................................................21

*Williams v. Blitz*,
    226 F.2d 463 (4th Cir. 1955) ........................................................................17

*Willis v. MCI Telecommunications*,
    177 F.R.D. 350 (1998)..................................................................................20

## STATUTES

15 U.S.C. § 1681(n) ...................................................................................1

15 U.S.C. § 1681(o) ...................................................................................1

15 U.S.C. § 1681i(a) ................................................................................42

15 U.S.C. § 1681i(a)(1) ...........................................................................41

15 U.S.C. § 1681n .....................................................................................40

15 U.S.C. § 1681o .....................................................................................40

15 U.S.C. § 1681s-2(a) ............................................................12, 39, 40, 41

15 U.S.C. § 1681s-2(b) ............................................................41, 42, 44, 46

15 U.S.C. § 1681s-2(b)(1) ...............................................................*passim*

15 U.S.C. § 1681s-2(b)(1)(A) ..................................................................43

15 U.S.C. § 1681s-2(b)(1)(A)-(D) ...........................................................42

15 U.S.C. § 1681s-2(b)(1)(A)-(E) ...........................................................41

15 U.S.C. § 1681s-2(b)(1)(B) .............................................................43, 44

15 U.S.C. § 1681s-2(c) ............................................................................40

15 U.S.C. § 1681sa-2(b)(1) ......................................................................43

15 U.S.C. § 1682i(a)(1) ...........................................................................48

15 U.S.C. § 1691i(a) ................................................................................42

15 U.S.C. § 1692 ......................................................................................34

15 U.S.C. § 1692e ...............................................................................26, 27

15 U.S.C. § 1692e(2)(A) ..................................................................25, 26, 27

15 U.S.C. § 1692e(2)(A)(5) ...................................................................1, 50

15 U.S.C. § 1692e(5) ..............................................................................25, 30

15 U.S.C. § 1692e(8) ......................................................................................32

15 U.S.C. § 1692e(10) ...........................................................................*passim*

15 U.S.C. § 1692f ...................................................................................*passim*

15 U.S.C. § 1692k(c) ...............................................................28, 29, 36, 39

N.C. GEN. STAT. § 1-52(1) ...............................................................30, 31

N.C. GEN. STAT. § 58-70-95(3) ................................................................1

N.C. GEN. STAT. § 58-70-110(4) ..............................................................1

N.C. GEN. STAT. § 58-70-115(1) .........................................................1, 31

N.C. GEN. STAT. § 75-54 ............................................................................1

## **RULES**

Fed. R. Civ. P. 12 ..........................................................................................18

Fed. R. Civ. P. 55 ..........................................................................................16

Fed. R. Civ. P. 55(c) .............................................................13, 14, 21, 22

Fed. R. Civ. P. 56(c) ...................................................................................25

Fed. R. Civ. P. 59(e) .............................................................................21, 22

Fed. R. Civ. P. 60(b)(1) .....................................................................21, 22

## <u>OTHER AUTHORITY</u>

10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2697 (2d ed. 1983) ..........................................................................................17

## STATEMENT OF THE CASE

Plaintiffs Narendra Mavilla ("Mr. Mavilla") and Padmavathi Mavilla ("Mrs. Mavilla," and together with Mr. Mavilla, the "Plaintiffs") commenced this action by filing an unverified complaint (the "Complaint") in the United States District Court, Eastern District of North Carolina (the "District Court"), on or about October 4, 2010. Plaintiffs brought claims against WakeMed Faculty Physicians (the company's actual name is WakeMed Faculty Practice Plan, hereinafter, "WakeMed") and against Absolute Collection Service, Inc. ("ACS") for alleged violations of: (1) the Fair Debt Collection Practices Act ("FDCPA"), specifically 15 U.S.C. §§ 1692e(2)(A)(5) and (10), and § 1692f; (2) the Fair Credit Reporting Act ("FCRA"), specifically 15 U.S.C. § 1681(n) and (o); and (3) certain subsections of the North Carolina Debt Collection Act (N.C. GEN. STAT. § 75-54) and North Carolina Collection Agency Act (N.C. GEN. STAT. § 58-70-95(3), -110(4), and -115(1)).[1] A civil summons was issued to ACS, identifying Harry Scott, Jr. as its registered agent. Documents subsequently filed with the District Court indicated that service was effected on ACS on our about October 8, 2010.

On October 12, 2010, ACS's general counsel, Ken Perkins ("Perkins"), was informed of the new suit against ACS. Corrected Joint Appendix ("JA") p. 97. Perkins called Plaintiffs' counsel, Chris Livingston ("Livingston"), towards the end

---

[1] The District Court declined to exercise jurisdiction on the state claims once it had granted summary judgment in favor of ACS on all of the federal claims.

of October 2010 and requested an unlimited extension of time to respond to the Complaint. JA p. 97. Perkins recalled that Livingston had agreed to such an extension with no predicate of good-faith settlement discussions. JA p. 97. Livingston admits that he spoke with Perkins around this time and that he gave Perkins an extension of time to answer the Complaint, but he believes that he only gave Perkins a thirty day extension to answer the complaint and that this extension was predicated on continued settlement discussions. JA p. 116. After speaking with Livingston, Perkins then instructed ACS to contact WakeMed about the allegations in the suit. JA pp. 97-98. Shortly thereafter, WakeMed realized it had made a billing error regarding the medical services at issue. JA p. 98. WakeMed informed ACS of the error, and asked ACS to remove the reports of this bill to credit agencies. JA p. 98.

On our about December 21, 2010, Plaintiff moved for default (the "Motion for Entry of Default") in this case against ACS and an entry of default (the "Entry of Default") was entered by the District Court clerk the same day. JA p. 23. Before filing the Motion for Entry of Default, Plaintiffs' counsel did not attempt to contact Perkins about ACS's delay in responding to the Complaint or to participate in settlement discussions. JA p. 98. Plaintiffs then moved for a default judgment (the "Motion for Default Judgment") on our about January 10, 2011. JA p. 24.

On January 18, 2011, the District Court issued an order regarding Plaintiffs' failures to address certain deficiency notices from the court (the "Order to Provide Additional Evidence"). JA p. 74. Specifically, the Order to Provide Additional Evidence addressed Plaintiffs' failure to adequately document facts supporting their claims and the damages to which they believed they were entitled in their Motion for Entry of Default and Motion for Default Judgment. JA p. 76. Plaintiffs contend they complied with the Order to Provide Additional Evidence when they submitted additional materials to the District Court on or about February 4, 2011. *See* JA p. 77-91.

On April 20, 2011, while reviewing a PACER docket print out, Perkins learned that Plaintiffs had obtained the Entry of Default against ACS and that they had filed the Motion for Default Judgment. JA p. 98. Perkins contacted the firm of Yates, McLamb, and Weyher, LLP and directed that firm to make an appearance in this case on behalf of ACS and to file a motion to set aside the Entry of Default (the "Motion to Set Aside"). JA p. 98. ACS filed the Motion to Set Aside, along with supporting documents and a supporting memorandum, on April 21, 2011. JA p. 92.

On July 25, 2011, after reviewing the submissions and briefs of all parties, the District Court entered an order granting ACS's Motion to Set Aside and denying the Plaintiffs' Motion for Default Judgment (the "Order Granting Motion

to Set Aside"). JA p. 122. On August 15, 2011, ACS filed and served an answer to the Complaint (the "Answer") per the Order Granting Motion to Set Aside. JA p. 131.

On July 30, 2011, ACS and Plaintiffs filed and served their cross-motions for summary judgment along with supporting materials. JA p. 138; JA p. 463. After responses to those motions were filed, on January 10, 2013, the District Court entered an order granting ACS's motion for summary judgment and denying Plaintiffs' motion for partial summary judgment (the "Summary Judgment Order"). JA p. 551.

On February 6, 2013, Plaintiffs filed their notice of appeal in this matter, stating that the Plaintiffs were appealing from (1) the District Court's Summary Judgment Order; (2) the September 28, 2012 order granting ACS's motion for leave to file a supplemental memorandum of law in support of its motion for summary judgment[2]; and (3) the Order Granting Motion to Set Aside. JA p. 579. The Plaintiffs then timely filed their opening brief and joint appendix in the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") on April 29, 2013, and a corrected opening brief (the "Opening Brief") and corrected joint appendix ("JA") on May 20, 2013.

---

[2] Despite listing this order in their notice of appeal, Plaintiffs do not raise any arguments regarding the propriety of this decision in their Opening Brief.

4

## STATEMENT OF THE FACTS

WakeMed often retains the services of ACS to help collect unpaid bills for medical services rendered by WakeMed and affiliated entities. On our about April 10, 2009, WakeMed sent ACS three particular "accounts" (bills for separate services) to be collected by ACS. JA p. 190. The accounts were for: (1) an office/outpatient visit (established) on June 13, 2005; (2) an office/outpatient visit (established) on June 30, 2005; and (3) care after delivery on July 26, 2006. JA pp. 161-63; *see also* JA p. 30. WakeMed informed ACS that the patient associated with these services was Mrs. Mavilla. JA p. 176; *see also* JA p. 30. WakeMed also provided an address and telephone number that corresponded to the home address of Mrs. Mavilla. JA p. 30.

On or about April 15, 2009, ACS began attempting to contact Mrs. Mavilla about payment for these accounts. Mrs. Mavilla first spoke with ACS about the WakeMed accounts during a telephone call sometime in April 2009. JA p. 414. Mrs. Mavilla did not believe that the WakeMed accounts belonged to her, so she asked ACS to provide a copy of any bill from WakeMed. JA p. 426. Soon thereafter she received a letter from ACS that included a copy of a WakeMed bill showing the three services at issue. JA p. 426. Mrs. Mavilla's current and correctly spelled name and address were on the WakeMed bill. JA pp. 421-22. Mrs. Mavilla admitted that the bill appeared to have been generated by WakeMed and not by

ACS. JA pp. 413-14. She said that ACS's name did not appear anywhere on the bill and that WakeMed's phone number was the only phone number on that bill. JA pp. 413-14. She admitted that she had no information that would tend to make her believe that the WakeMed bill had been created by ACS. JA pp. 413-14.

After Mrs. Mavilla received a copy of the WakeMed bill, she promptly called WakeMed directly to dispute the bill. JA p. 426. At that point WakeMed told Mrs. Mavilla that it would investigate the matter. JA pp. 427-28. Shortly thereafter, Mrs. Mavilla followed up with another call to WakeMed. JA pp. 427-28. At that time WakeMed told her that it had done an internal review of the accounts, concluded that the accounts belonged to Mrs. Mavilla, and that she would have to pay those bills. JA pp. 427-28. Mrs. Mavilla testified that she had possibly as many as seven further phone calls with WakeMed, during which she tried to convince WakeMed that the accounts did not belong to her; but each time WakeMed told her the same thing—that it believed that the disputed accounts belonged to Mrs. Mavilla.[3] JA pp. 431-32.

Despite repeated phone calls by the Plaintiffs directly to WakeMed disputing these particular accounts, and despite WakeMed's repeated responses that it

_____

[3] The Plaintiffs also filed a state court civil action in North Carolina alleging that WakeMed "with corrupt intent to defraud or extort money from [the Plaintiffs], unlawfully fabricated false records purported to prove that [WakeMed] had provided prenatal and obstetric care to Mrs. Mavilla in 2003, 2005, and 2006." JA p. 425-26. The "false record[]" referred to in the state court complaint is the same WakeMed bill that is at issue in this case.

believed the accounts belonged to Mrs. Mavilla, the Plaintiffs still contend that ACS should have further investigated the accounts placed with ACS for collection. However, any such investigation would have been futile by Plaintiffs' own admission. JA p. 457. Specifically, Mrs. Mavilla admitted that ACS would have had to call WakeMed in the course of any further investigation of the disputed accounts. JA p. 457. She also admitted that if ACS had done so, WakeMed would have told ACS the same thing that WakeMed had told the Mavillas, which was that WakeMed believed that the accounts were properly attributed to the Mavillas. JA pp. 457-58.

The Plaintiffs did not offer any evidence that would indicate that ACS fabricated or falsely created any bill for the medical services in question. JA p. 426. Despite her dispute with WakeMed, Mrs. Mavilla did not have any information that would show that ACS knew that the disputed accounts did not belong to her during the time when ACS was calling her. JA p. 432. Mrs. Mavilla testified that at some point these disputed accounts were reported as unpaid to a credit reporting agency ("CRA"). JA pp. 432-33. However, she could not cite any evidence indicating that ACS had any knowledge that the disputed accounts were not hers at the time ACS reported them to any CRA. JA pp. 432-33.

The Plaintiffs testified that they received "daily" calls from ACS. JA p. 428. However, the ACS account notes and call logs showed much more infrequent calls,

and that the majority of those calls went unanswered. JA pp. 465-73. During the same time frame that ACS was calling them, the Plaintiffs also reported receiving several "dunning" letters regarding the disputed WakeMed accounts. Ultimately the Plaintiffs sent a cease and desist letter to ACS on or about August 24, 2009 (the "Cease and Desist Letter"), requesting that ACS cease all further communication with them regarding these accounts. JA pp. 15. There are no allegations that ACS attempted to contact the Plaintiffs after it received the Cease and Desist Letter. JA p. 472.

ACS eventually reported these three unpaid accounts to various CRAs. The $312.00 account balance for the July 26, 2006 service was reported to certain CRAs on or about September 6, 2009. JA p. 197. The $126.00 account balance for the June 13, 2005 services and the $54.00 account balance for the June 30, 2005 services were reported on November 8, 2009. JA p. 197. In letters dated November 17, 2009, ACS informed the Plaintiffs that these debts had been reported to a CRA. JA pp. 46-47. In December 2009, the Plaintiffs paid the $126.00 balance and the $54.00 balance. JA pp. 351-52. ACS reported these payments to the relevant CRAs on January 3, 2010. JA pp. 465-73. About nine months later, on September 27, 2010, ACS received a dispute verification request for all three accounts from the CRAs through E-OSCAR, likely as a result of recent applications for financing executed by the Plaintiffs. JA pp. 465-73. Apparently, the Plaintiffs had attempted

to obtain a Kohl's credit card on or about September 21, 2010, and they also applied to refinance their home around September 22, 2010.[4]  JA pp. 378-79; 392-94. In response to the E-OSCAR request, ACS reported that two of the accounts were verified as reported and paid and the third account, with a balance of $312.00, was verified as reported and noted to be in dispute. JA pp. 465-73. Five days after ACS received the notice through E-OSCAR, the Plaintiffs filed the Complaint, alleging, among other things, that ACS knowingly reported the Plaintiffs' "false debts" and maliciously furnished false credit information to a consumer reporting agency. JA p. 17. After the Plaintiffs filed suit against ACS and WakeMed, WakeMed identified its error and asked ACS to remove the erroneous information from the credit reports. JA p. 98.

In the Complaint, the Plaintiffs appeared to allege that ACS was improperly attempting to collect a debt beyond a three year statute of limitations. JA pp. 15-16. However, Mrs. Mavilla testified that during the time that ACS was calling her and asking her to pay the disputed WakeMed accounts, ACS never threatened to file a lawsuit in civil court to try to collect these debts. JA p. 40. Mrs. Mavilla also understood that even though three years may have passed after the date that a debt

---

[4] Mr. Mavilla claims that he denied a home refinancing loan because ACS reported these accounts to CRAs. However, Mr. Mavilla also admitted that after the credit information was removed from the credit reporting services, he reapplied for a home refinancing loan with the same lender but he was still turned down because his home was "underwater." JA pp. 381-82.

was incurred, that debt was not simply eliminated by the passage of time. JA pp. 40-41.

There are some misstatements of facts in Plaintiffs' Opening Brief that require a specific response. These responses do not create a genuine issue of material fact. In fact, an accurate reporting of undisputed facts does not create a factual dispute. First, there is Plaintiffs' statement that ACS has a policy never to verify WakeMed Accounts independently. Opening Brief p. 4. Christopher Malmfelt ("Malmfelt"), the Chief Operating Officer at ACS, testified that ACS had procedures in place to verify that information being provided by a client was accurate. JA p. 176.  In this case, the Plaintiffs admit that when they called ACS and asked for a copies of any relevant bills, ACS provided them with a copy of an itemized statement from WakeMed, thus showing that ACS had requested such a statement in order to verify the debt. JA p. 426.

Plaintiffs also incorrectly misstate that ACS "re-aged" the debts at issue by "altering" their "opening" dates from June 2005 or July 2006 to April 2009, allegedly in order to make the debts look more recent. Opening Brief p. 36. Plaintiffs cite the "date opened" field in their credit report exhibits as evidence on this point. JA pp. 49-51. However, this field on the credit report merely shows the month and year (4/2009) when the account was "opened," or first placed, with ACS by WakeMed for collection.

# SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in setting aside the Entry of Default against ACS. Plaintiffs' protestations aside, ACS demonstrated good cause for the District Court to set aside the Entry of Default based partly on ACS's corporate counsel's understanding as to an agreement for an informal extension of time with Plaintiffs' counsel. The District Court analyzed the factors listed under Rule 55(c) and appropriately determined—with supporting factual findings—that ACS had acted with reasonable promptness, that it had a meritorious defense, that that there was no history of dilatory action with the District Court, and that there was admittedly no prejudice to the Plaintiffs in setting aside the Entry of Default. The District Court simply followed the strong preference in the Fourth Circuit that defaults should be avoided and that claims and defenses should be disposed of on their merits.

With regard to the alleged violations of debt collection statutes and credit reporting statutes, this case can be reduced to one simple statement: A debt collector is not liable under federal debt collection laws and credit reporting statutes for collection and reporting of an "erroneous" debt when the Plaintiff admits that the error originated solely with the creditor and the debt collector had no knowledge of the creditor's error.

11

The Plaintiffs admit that before ACS was ever involved, WakeMed, the creditor in this instance, created a bill for services that WakeMed incorrectly attributed to the wrong patients/guarantors, the Plaintiffs. WakeMed later sent the incorrect accounts to ACS for collection. The Plaintiffs admit that after being contacted by ACS about these particular debts, they called WakeMed directly. WakeMed subsequently told the Plaintiffs that it had conducted a separate investigation into the disputed accounts and it still believed that the medical services were properly charged to them. It was not until after the Plaintiffs initiated this litigation against WakeMed and ACS that WakeMed determined that the charges were incorrectly assigned to Mrs. Mavilla. There is no dispute that when ACS contacted the Plaintiffs about the WakeMed accounts, ACS was relying on information provided by WakeMed and on WakeMed's repeated verification that the disputed debts belonged to the Plaintiffs. Whether analyzed under the subsections of the FDCPA cited by the Plaintiff or under the *bona fide* error defense provided by that statute, the Plaintiffs have not only failed to raise a genuine issue of material fact, but they do not even have a viable claim against ACS.

ACS should not be liable under the FCRA for the same reasons stated above. In addition, the Plaintiffs do not have a private right of action under § 1681s-2(a) of the FCRA. The District Court correctly ruled that there was no breach of

§ 1681s-2(b)(1) of the FCRA because the Plaintiffs had initiated their suit before the time period had ended for ACS to conduct an investigation. The District Court also correctly ruled that the Plaintiffs had failed to meet their burden on their FCRA claim because they did not show what specific information had been provided to ACS by a CRA that ACS allegedly did not investigate. Even still, the undisputed record shows that ACS reported the WakeMed accounts to a CRA after relying on verification information obtained from WakeMed. Thus, ACS properly complied with the investigatory requirements under the FCRA by yet again confirming the disputed accounts information with WakeMed. Contrary to the Plaintiffs' argument, the statute does not require a commercial business like ACS to conduct a detailed medical evaluation to determine if it was physically possible for the purported debtor to receive the medical services shown on the WakeMed bill. That is simply not the kind of "reasonable investigation" that was contemplated by the statute.

## **ARGUMENT**

## I.   THE DISTRICT COURT PROPERLY SET ASIDE THE ENTRY OF DEFAULT

### A.   Standard of review

Rule 55(c) of the Federal Rules of Civil Procedure provides that "[f]or good cause shown the court may set aside an entry of default." FED. R. CIV. P. 55(c). When deciding whether such good cause exists, a district court should consider (1)

whether the moving party has a meritorious defense; (2) whether it acts with reasonable promptness in moving to set aside the entry of default; (3) the personal responsibility of the defaulting party; (4) the prejudice to the party; (5) whether there is a history of dilatory action; and (6) the availability of sanctions less drastic. *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204-05 (4th Cir. 1967).

An appellate court reviews a district court's decision to set aside an entry of default for abuse of discretion. *Payne*, 439 F.3d at 203; *Consolidated Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967). Specifically, "[t]he disposition of motions made under Rule [ ] 55(c) ... is a matter which lies largely within the discretion of the trial judge and his action is not lightly to be disturbed by an appellate court." *Consolidated Masonry*, 383 F.2d at 251.

Furthermore, the Fourth Circuit has repeatedly expressed a strong preference that, as a general matter, defaults are to be avoided and that claims and defenses should be disposed of on their merits. *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010); *see also*, *Tazco, Inc. v. Director, Office of Workers Compensation Program, U.S. Dep't of Labor*, 895 F.2d 949, 950 (4th Cir. 1990) ("The law disfavors default judgments as a general matter."); *Consolidated Masonry*, 383 F.2d at 251 ("Generally a default should be

14

set aside where the moving party acts with reasonable promptness and alleges a meritorious defense.").

### B. Plaintiffs' argument that the District Court violated its own rules in setting aside the default judgment is wholly without merit

Plaintiffs begin by essentially arguing that the District Court somehow abused its discretion by considering the testimony in Perkins's sworn affidavit, which stated that Perkins believed he had unlimited time to file an answer pursuant to an oral agreement with Plaintiffs' counsel. Opening Brief p. 18. The District Court, however, was required to consider this evidence when weighing the six factors relevant to whether to set aside the Entry of Default. Specifically, as spelled out in the Order Granting Motion to Set Aside, this particular testimony addressed whether ACS was personally responsible for the delay in filing an answer. JA p. 128.

Plaintiffs' argument that the District Court somehow violated its own rule by "allowing" an oral agreement for an extension of time patently misconstrues the Order Granting Motion to Set Aside. JA p. 128. Contrary to the Plaintiffs' contentions, the District Court never blessed such an oral extension of time, but rather noted that such extensions are explicitly not permitted in the Eastern District under Local Rule 6.1. JA p. 128. The District Court made no ruling on whether such an agreement was acceptable, but rather noted that based on the sworn testimony in Perkins's, a misunderstanding had likely occurred. JA p. 128. As

15

such, the District Court explained that "[w]hile defense counsel certainly should have known better, there is no suggestion that the misunderstanding is attributable to his client, ACS." JA p. 128. Thus, the District Court merely considered the testimony of ACS's corporate counsel in order to exercise its discretion in weighing the factors relevant to the Motion to Set Aside. Ultimately, after considering the testimony proffered in the affidavits, the District Court concluded that ACS was not personally responsible for the delay. JA p. 128.

Plaintiffs' suggestion that the District Court's decision to set aside the Entry of Default based on, among other things, evidence of a possible misunderstanding "for all practical purposes… repealed Rule 55" and that "henceforth almost no entry of default will ever survive in the Fourth Circuit if the decision below becomes precedent" is a gross exaggeration and simply ridiculous. Opening Brief p. 18. As discussed above, the District Court merely followed the Fourth Circuit's strong preference for disposing of cases of on their merits. *Colleton Preparatory Acad., Inc*, 616 F.3d at 417; *Tazco, Inc.*, 895 F.2d at 950; *Consolidated Masonry & Fireproofing*, 383 F.2d at 251. Furthermore, any doubts about setting aside the default should be resolved in favor of hearing the case on the merits. *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969). Here, the District Court simply resolved any doubts about a potential misunderstanding as to the time to file an answer in favor of hearing the case on the merits. The District Court did not abuse its

discretion or effectively repeal a Federal Rule of Procedure by following well-settled law in the Fourth Circuit and favoring resolution of the case on the merits. The Plaintiffs simply do not like that the merits of the case were resolved in ACS's favor.

### C.    ACS demonstrated good cause to set aside the Entry of Default

ACS clearly demonstrated good cause to set aside the entry of default in this case. While the District Court must consider all six of the factors outlined above, the meritorious defense and reasonable promptness factors are given the most weight. *Consolidated Masonry & Fireproofing, Inc.*, 383 F.2d at 251.

#### 1.    *ACS established the presence of a meritorious defense*

First and foremost, ACS demonstrated the presence of a meritorious defense—the fact that ACS ultimately prevailed in the case, and prevailed at the summary judgment stage at that, is only further subsequent evidence that ACS's defenses against the Plaintiffs' claims were meritorious. Nevertheless, in the context of the Motion to Set Aside, all that was required of ACS was

> a proffer of evidence which would permit a finding for the defaulting party or which would establish a valid counterclaim. *Central Operating Co. v. Utility Workers of America*, 491 F.2d 245, 252 n. 8 (4th Cir. 1974); *Williams v. Blitz*, 226 F.2d 463 (4th Cir. 1955). "The underlying concern is ... whether there is some possibility that the outcome ... after a full trial will be contrary to the result achieved by the default." 10 C. Wright, A. Miller & M. Kane*, Federal Practice and Procedure* § 2697, p. 531 (2d ed. 1983).

*Augusta Fiberglass Coatings, Inc., v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988).

The Plaintiffs argue that ACS's affirmative defenses were somehow barred "because they appeared only in affidavits, not in an answer to the Complaint." Opening Brief p. 23. Plaintiffs erroneously cite to Rule 12 for their contention that the only way ACS could present these defenses was in an answer. Opening Brief p. 23. This contention is illogical. A default is entered only in cases where a party fails to file an answer. Requiring a defaulting party to show a meritorious defense in an answer that by definition was never filed simply makes no sense at all.

Furthermore, Plaintiffs attempt to argue that ACS was somehow required to "prove" its defenses at this stage, by attaching "training materials, procedure manuals, investigative guidelines, compliance memoranda, and records pertinent to Mrs. Mavilla's alleged debts…" Opening Brief p. 26. This assertion misconstrues the law. As discussed above, in the context of showing a meritorious defense that would warrant setting aside an entry of default, ACS simply needed to proffer evidence that would establish some possibility that the outcome will be contrary to the result achieved by default. *Augusta Fiberglass Coatings*, 842 F.2d at 812. The Plaintiffs boldly contend that "[t]here is a vast difference between a minimal showing of a meritorious defense, which is what the successful defendants in [*Augusta Fiberglass*] did, and not showing a meritorious defense at all." However,

just like the defendants in *Augusta Fiberglass*, ACS proffered affidavits with its Motion to Set Aside—affidavits that the District Court concluded set forth sufficient facts showing that ACS had no knowledge that it was billing the wrong person. JA pp. 126-127. The District Court found that this proffer of evidence established the existence of a meritorious defense. JA pp. 126-127. The Plaintiffs' blanket assertions that ACS was somehow required to prove its defenses at this stage in the case, without any authority to back them up, are simply unfounded. That ACS *was* ultimately able to prove its defenses in the context of a successful summary judgment motion, and that the actual outcome of the case *was* contrary to the result achieved by default, are only further evidence that the Entry of Default was properly set aside.

### 2.    *ACS acted with reasonable promptness in filing the Motion to Set Aside*

In addition, the District Court found that ACS acted with reasonable promptness. Specifically the District Court found that "ACS's counsel acted immediately upon learning that plaintiffs had obtained an entry of default." JA p. 127. Plaintiffs appear to confuse promptness in responding to the Complaint with promptness in responding to the Entry of Default. The relevant inquiry is whether the defendant acted with reasonable promptness to set aside *the entry of default*. *See Payne*, 439 F.3d at 204-05. It is undisputed that ACS filed its Motion to Set Aside within a day after receiving notice of the Entry of Default. Where there are

19

cases holding that even a delay of eight days constitutes reasonable promptness in moving to set aside an entry of default, Plaintiffs cannot seriously argue that filing the Motion to Set Aside a day after receiving notice was not reasonably prompt. *See*, *e.g.*, *Willis v. MCI Telecommunications*, 177 F.R.D. 350 (1998). The Plaintiffs' attempts to misdirect the Court as to the relevant time-frame by referencing the confusion surrounding ACS's delay in answering the Complaint are inappropriate.

### 3.    *ACS was not personally responsible for the delay*

As discussed above, any delay in filing an answer in the case was the result of a misunderstanding between Plaintiffs' counsel and ACS's corporate counsel. Indeed, the fact that Livingston and Perkins have such different recollections of what transpired during their initial conversations is only more evidence that some kind of misunderstanding must have occurred. There is no dispute that the parties were in contact after ACS was served with the Complaint, and there is no dispute that Livingston never advised ACS that the Plaintiffs intended to seek an entry of default. ACS did not file an answer to the Complaint because it was under the impression that it had an unlimited time to do so. JA p. 98. Moreover, any delay in filing an answer was due to the mistake and inadvertence of ACS's corporate counsel, and was no fault of ACS. JA p. 98. Because the failure was solely the neglect of counsel, it was not fairly imputable to ACS. JA p. 128.

20

Plaintiffs argue that because Perkins was not outside counsel or some other third party, his mistake must be imputed to ACS due to his role as corporate counsel. The Fourth Circuit's general rule is that "a blameless party not be disadvantaged by the errors or neglect of his attorney which cause a final, involuntary termination of proceedings." *United States v. Moradi*, 673 F.2d 725, 728 (4th Cir. 1982) *See also Augusta Fiberglass*, 843 F.2d 808, 811-12 (4th Cir. 1988). Plaintiffs cite to no authority in support of their position that mistakes may only be made by *outside* counsel in order to receive this protection.

The only case Plaintiff cites for its position that that "attorney inattentiveness to litigation is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant" is *Robinson v. Wix Filtration Corp. LLC*, *Robinson*, 599 F.3d 403, 413 (4th Cir. 2010). This case is completely inapposite. The *Robinson* court analyzed a district court's refusal to amend a judgment under Rule 59(e) and refusal to consider a motion for relief from judgment under Rule 60(b)(1). Plaintiffs pull out the aforementioned language and argue that "there is no reason to apply different standards to Rule 55(c) and ACS." Opening Brief p. 29. On the contrary, there is every reason to apply different standards to the evidence required for a motion under Rule 55(c) and those under Rule 59(e) or Rule 60(b)(1)—the rules and the case law demand it.

21

Specifically, in order to amend a judgment under Rule 59(e), the moving party must show: (1) an intervening change in the controlling law; (2) new evidence that was not available at trial; or (3) that there has been a clear error of law or a manifest injustice. *Robinson*, 599 F.3d at 407. In order to set aside a judgment under Rule 60(b)(1), the movant must show "mistake, inadvertence, or excusable neglect." *Id.* at 413. The case law thus requires that a court apply completely different standards to motions to change or vacate *judgments* under Rule 59(e) and Rule 60(b)(1) than the weighing of the six factors required to have an entry of default set aside under Rule 55(c). Furthermore, even when analyzing whether to vacate a default judgment under Rule 60(b)(1), the Fourth Circuit has explicitly held that that "when [a] party is blameless and the attorney is at fault, the [court's interest in reaching the merits] control[s] and a default judgment should ordinarily be set aside." *Augusta*, 843 F.2d at 811. That is, "when the party is blameless, his attorney's negligence qualifies as a 'mistake' or as 'excusable neglect' under Rule 60(b)(1)." *Id.*

Despite the Plaintiffs' arguments to the contrary, this is not a situation where ACS's counsel was inattentive to the litigation—rather, as stated in his affidavit, Perkins promptly contacted Plaintiffs' counsel after being served with the Complaint to negotiate an extension of time to file an answer. Mistakenly believing that he had time to do so, he inadvertently missed the deadline, and an Entry of

22

Default was entered against ACS. The District Court properly concluded that such a mistake was not imputable to ACS, and that this factor weighed in favor of setting aside the Entry of Default in this case. JA p. 128.

### 4.    *ACS has no history of dilatory behavior*

Plaintiffs argue that because ACS has defaulted in other cases it has a history of dilatory action that warranted denial of the Motion to Set Aside. However, ACS admits that it has sometimes strategically defaulted in certain cases, in order to minimize damages and limit attorneys' fees—those cases were resolved for nominal amounts. JA p. 98. As such, those defaults were not examples of ACS being dilatory and simply ignoring lawsuits against it—instead, they are examples of ACS weighing its options, and deciding whether allowing an entry of default and a subsequent default judgment would be more cost effective than defending the case on its merits. Furthermore, the District Court explicitly found that while ACS has a history of litigation in the Eastern District of North Carolina, none of those cases had resulted in a default against ACS. JA p. 129. Thus, the District Court properly concluded that ACS does not have a history of dilatory behavior that would weigh in favor of letting the Entry of Default stand. JA p. 129.

### 5. *Plaintiffs have admitted that sanctions less drastic were available and that they would suffer no prejudice if the Entry of Default were set aside*

As to the factors of availability of sanctions less drastic and prejudice to the parties, the Plaintiffs have admitted that these factors do not apply in this case. In their response to the Motion to Set Aside, Plaintiffs clearly stated that to award attorneys' fees as a less drastic sanction "would be perfectly futile here" JA p. 129. Put simply, Plaintiffs admitted that less drastic sanctions were available at the time, but they simply did not like that option. In the same document, Plaintiffs also expressly stated that "[i]t is true that Plaintiffs suffer no prejudice from having to prove their case." JA p. 128. After having admitted these facts in their response to the Motion to Set Aside, the Plaintiffs cannot now reasonably try to argue that they are prejudiced after the fact simply because the case did not ultimately go their way.

Plaintiffs also argue that they had somehow already proven their case at the time of ACS's Motion to Set Aside, by filing supporting documents and a Motion for Default Judgment against ACS, which ultimately became moot when the Entry of Default was set aside. Opening Brief p. 29. As the District Court correctly pointed out, "Plaintiffs' assertion that they 'have proved liability and damages beyond any reasonable doubt with specific documents and sworn affidavits' is mistaken." JA p. 128. Indeed, an entry of default by definition is *not* a judgment on

the merits—the record clearly reflects that the District Court never made any findings or rulings on the merits of the Plaintiffs' case until it decided against them as a matter of law at the summary judgment stage.

Thus, each and every factor weighs in favor of the District Court's decision to set aside the Entry of Default and let the case proceed on its merits.

## II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR ACS ON ALL FDCPA CLAIMS

In Count IV of the Complaint, Plaintiffs alleged that ACS violated 15 U.S.C. §§ 1692e(2)(A), (5), and (10), and 1692f. Because ACS had no knowledge that the debts did not belong to the Plaintiffs, because ACS never threatened suit to collect the debts, and because the Plaintiffs have not alleged or shown any "unfair or unconscionable" actions by ACS, the District Court properly granted summary judgment in favor of ACS as to the FDCPA claims.

### A.    Standard of review

An appellate court reviews an award of summary judgment *de novo*. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2546, 2548 (1986). In considering a motion for summary judgment, the court should construe the "facts and inferences drawn

25

therefrom in the light most favorable to the nonmoving party." *Seabulk Offshore, Ltd. V. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2001). The party moving for summary judgment must prove the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex*, 477 U.S. at 323. In determining whether summary judgment is appropriate, the court does not weigh evidence or make findings of fact, but rather must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 251-52.

**B.     There is no genuine issue of material fact as to the Plaintiffs' claims under §§ 1692e(2)(A) and (10), because it is undisputed that the accounting error was WakeMed's, and ACS was entitled to rely on the creditor to provide accurate account information**

15 U.S.C. § 1692e(2)(A) provides that a debt collector may not make a false representation of "the character, amount, or legal status of any debt." § 1692e(10) provides that a debt collector may not use "any false representation or deceptive means to collect or attempt to collect any debt…" As the District Court explained in the Summary Judgment Order, the Plaintiffs did not identify "by what conduct or to whom ACS allegedly made a false representation" in violation of § 1692e(2)(A) within the one-year statute of limitations applicable to § 1692e. JA p. 572. The District Court also explained that "it is not apparent from the

Complaint or the Mavillas' memoranda exactly what conduct by which they intend to prove ACS violated subsection e(10)." JA p. 573. In addition, the District Court noted that to the extent Plaintiffs were attempting to argue that ACS's allegedly "'falsely report[ed] both the $54 account and the $126 account as paid collection items on Mrs. Mavilla's consumer credit reports,' it is uncontested that the Mavillas in fact *did* pay those bills in December 2009." JA p. 572.

Assuming that the basis for Plaintiffs' claims under these sections are the unspecific allegations that ACS reported delinquent accounts to various credit bureaus in Mrs. Mavilla's name when the delinquent accounts did not actually belong to her, the District Court nevertheless properly granted summary judgment in favor of ACS on these claims.

Under § 1692e, a debt collector "may reasonably rely upon information provided by a creditor who has provided accurate information in the past." *Beattie v. D.M. Collections, Inc.*, 754 F. Supp. 383, 392 (D. Del. 1991) (citing *Howe v. Reader's Digest Ass'n, Inc.*, 686 F. Supp. 461, 467 (S.D.N.Y. 1998). For example, in *Beattie v. D.M. Collections, Inc.*, the plaintiffs alleged that a creditor violated 15 U.S.C. § 1692e(2)(A) by attempting to collect a debt that did not actually belong to them. *Beattie*, 754 F. Supp. at 392. The court found that a cause of action for false representation of the "character, amount, or legal status of any debt" under § 1692e(2)(A) was designed to prohibit *intentional* conduct; therefore ethical debt

collectors should be allowed to "make occasional unavoidable errors without subjecting themselves to automatic liability." *Id.*

Despite the Plaintiffs' bare assertions that strict liability should apply in this case, the case law and the statute itself belie this position. First and foremost, the FDCPA has a built-in defense—suggesting that, by definition, the FDCPA cannot be a strict liability statute—in 15 U.S.C. § 1692k(c). This portion reads:

> (c) Intent
> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). Thus, by expressly stating that a debt collector may not be held liable for violations that were not intentional and resulted from a *bona fide* error, the statute itself directly contradicts the Plaintiffs' position that some standard of strict liability should have been used by the District Court when deciding whether to grant ACS summary judgment on the FDCPA claims. Furthermore, the case Plaintiffs cite in support of their argument that strict liability should apply, *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 235 (4th Cir. 2007), actually states the exact *opposite*. Specifically, *Sayyed* explains that "[t]he [FDCPA] also provides the exclusive method of considering whether the [debt collector]'s false statements were the product of reasonable reliance upon another

28

party: the *bona fide* error defense of § 1692k(c)." *Id.* Therefore, under the FDCPA, a debt collector is entitled to show that it is not subject to liability due to "reasonable reliance upon another party." *Id.*

In this case, Plaintiffs do not dispute that ACS had no knowledge of the fact that WakeMed had charged these accounts to them in error. In fact, Mrs. Mavilla testified at her deposition that ACS did not have access to information needed to investigate and determine whether or not the medical services had been properly charged to Mrs. Mavilla. JA p. 457. Mrs. Mavilla had already repeatedly requested that such an investigation be undertaken by WakeMed, and had repeatedly been told directly by WakeMed that the disputed services were hers. JA pp. 431-32. Mrs. Mavilla admitted that it was fair to assume that even if ACS made a separate call to WakeMed to inquire about the disputed accounts, WakeMed would have told ACS the same thing that WakeMed told the Plaintiffs—that WakeMed believed that the services were properly charged to Mrs. Mavilla. JA pp. 457-58.

In sum, ACS did not know that the accounts did not belong to the Plaintiffs, and ACS reasonably relied on the information provided to it by the creditor in this case, WakeMed. Because ACS did not know the accounts did not belong to the Plaintiffs when it reported them as delinquent to the CRAs, it simply made an "unavoidable error" based on WakeMed's faulty accounting. Because all parties agree that the accounting error was WakeMed's and not ACS's, no genuine issue

29

of material fact exists as to this claim, and the District Court properly granted summary judgment in favor of ACS.

**C.    ACS did not violate § 1692e(5) as a matter of law, because a statute of limitations only bars filing of a civil suit to collect a debt—it does not prevent collection by other lawful means**

§ 1692e(5) provides that a debt collector may not threaten "to take any action that cannot legally be taken or that is not intended to be taken" in connection with the collection of a debt. Plaintiffs appeared to allege in the Complaint that ACS threatened to file civil suits to collect this debt beyond the statute of limitations. JA pp. 15-16. The relevant paragraph reads "Even if these were valid debts, the statute of limitations on consumer debt is three years from the date of last activity per NCGS § 1-52(1)." JA pp. 15-16. As it is common knowledge that a statute of limitations only applies as a bar to filing a civil suit, ACS understood this paragraph to mean that Plaintiffs alleged that ACS had threatened legal action in connection with collecting the debts in question. However, as discussed above, Mrs. Mavilla admitted during her deposition that ACS never said that it would file a lawsuit to collect the debts for the disputed WakeMed accounts. JA p. 40. She also further admitted that she understood that the expiration of the statute of limitations does not extinguish a debt. JA pp. 40-41. Thus, the District Court properly found that there were "no threats of civil litigation contained in any

correspondence from ACS that the plaintiffs have revealed in support of their position." JA p. 572.

Plaintiffs now take the position that they "did not even attempt to argue a blanket ban on collection of a stale debt." Opening Brief p. 35. Instead, they now argue *for the first time* that the FDCPA "would consider violation of state law to be unfair or unconscionable." Opening Brief p. 35. Specifically, the Plaintiffs argue that ACS allegedly violated NCGS § 58-70-115(1) by "[s]eeking or obtaining any written statement or acknowledgment in any form containing ... an acknowledgement of any debt barred by the statute of limitations [three years; *see* NCGS § 1-52(1)] ... without disclosing the nature and consequences of such affirmation or waiver and the fact that the consumer is not legally obligated to make such affirmation or waiver."

The Plaintiffs *never made this argument* in the District Court. They cannot use this appeal to raise arguments they now wish they had made the first time. This argument is merely a regurgitation of one of their state law claims that the District Court declined to hear—the Plaintiffs are now improperly trying to sneak in this argument under the umbrella of an FDCPA claim. Assuming, *arguendo*, that this Court is willing to entertain an argument that was not brought before the District Court, it nevertheless fails on the merits. The Plaintiffs do not allege that ACS ever sought any kind of written acknowledgement that would revive the statute of

limitations on the debt and thus require any such disclosure. The only acts ever described by the Plaintiffs as allegedly violative of any provision of the FDCPA are mailing dunning letters and making phone calls. Indeed, the District Court noted that despite Plaintiffs' bare assertions to the contrary, "expiration of the statute of limitations to file a lawsuit to recover a debt does not prevent a collector from attempting to collect it by other lawful means." JA p. 572. Accordingly, no genuine issue of material fact exists as to this claim, and the District Court properly granted summary judgment in favor of ACS.

### D.    Plaintiffs never alleged any violations of § 1692e(8) in the Complaint and cannot use this appeal to do so now

Once again, Plaintiffs improperly attempt to make a new argument for the first time in the course of this appeal, by reformatting their argument under the FCRA that ACS somehow "re-aged" the debts into an alleged violation of the FDCPA under § 1692e(8). Assuming, *arguendo*, that this Court is willing to entertain still another argument that was not brought before the District Court, this argument also fails on the merits. As discussed above, the Plaintiffs' allegations that ACS somehow "re-aged" the tradelines to make them look more recent are unfounded. The dates of service for the three accounts in question on all statements and records have always appeared as June 13, 2005, June 30, 2005, and July 26, 2006. JA pp. 161-63; *see also* JA p. 30. These three accounts were referred to ACS by WakeMed for collection on April 10, 2009, and they were reported as unpaid to

32

the tradelines in September and November of 2009. JA p. 197. The only reason that the date "4/2009" appears on the credit report is because that is simply the date when the accounts were placed with ACS for collection. JA pp. 49-51. Plaintiffs have pointed to no evidence to support their bare allegations that ACS altered the dates of service in any way. In fact, the record clearly establishes that they did not.

### E. ACS was entitled to summary judgment on the § 1692f claim, because the Plaintiffs did not sufficiently allege that any such violation occurred

§ 1692f provides that a debt collector "may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The statute then goes on to provide a list of specific conduct that would violate this section of the FDCPA, none of which appear to apply, or are alleged to specifically apply in this case.[5]

---

[5] § 1692f  lists the following conduct as examples of activities that would violate this section:

> **(1)** The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.
> **(2)** The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

As the District Court aptly noted, "it is impossible to determine from the Complaint or memoranda the specific factual bases upon which the Mavillas rely in alleging ACS violated the alleged subsections of § 1692." JA p. 574. The only means by which the Plaintiffs allege that ACS attempted to collect from them were

---

**(3)** The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

**(4)** Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

**(5)** Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

**(6)** Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

    **(A)** there is no present right to possession of the property    claimed as collateral through an enforceable security interest;

    **(B)** there is no present intention to take possession of the property; or

    **(C)** the property is exempt by law from such dispossession or    disablement.

**(7)** Communicating with a consumer regarding a debt by post card.

**(8)** Using any language or symbol, other than the debt collector's    address,    on    any    envelope    when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

15 U.S.C. § 1692f. Plaintiffs' Complaint alleges violations of § 1692f generally—no specific subsection is cited as applicable in this case.

sending several dunning letters and reporting their accounts to CRAs. Such activities are legitimate and standard means of debt collection, and cannot possibly be considered "unfair or unconscionable."

Plaintiffs appear to argue that because these debts were erroneously attributed to them, such error is enough to transform legitimate debt collection activities into unconscionable ones. This argument is belied by common sense and a complete lack of case law. As discussed above, under the FDCPA, debt collectors are allowed to "reasonably rely upon information provided by a creditor who has provided accurate information in the past." *Beattie* 754 F. Supp. at 392. Because ACS was reasonably relying on WakeMed to provide them with accurate account information, and because ACS was using standard debt collection practices to collect what it reasonably believed to be valid debts, ACS did not violate § 1692f. Indeed, as the District Court held, "[i]t is not a violation of the FDCPA for a debt collector to seek payment of an alleged debt by making telephone calls and writing letters that do not violate the law... Nor is it a violation to report a delinquent debt to a CRA in compliance with applicable laws and regulations" JA pp. 574-75. Therefore there is no genuine issue of material fact as to the § 1692f claim, and the District Court properly granted summary judgment as to this claim.

35

**F.    ACS was entitled to summary judgment on the FDCPA claims because any alleged misconduct was a result of a *bona fide* error under § 1692k(c)**

15 U.S.C. § 1692k(c) provides that

> [a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). "Logically, if a debt collector reasonably relies on the debt reported by the creditor, the debt collector will not be liable for any errors." *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (citing *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992) (finding no violation because the creditor listed incorrectly the amount owed when it referred the debt to the debt collector)).

Furthermore, "numerous courts have held…that the FDCPA does not require a debt collector to independently investigate the merit of the debt and that a debt collector can rely on its clients' representations regarding the validity of the debt." *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 160-61 (D. Me. 2011) (citing *Clark*, 460 F.3d at 1174 ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt. Moreover, the FDCPA did not impose upon them any duty to investigate independently the claims presented[.]") (internal citations omitted); *see also Shapiro v. Haenn*, 222 F. Supp. 2d 29, 44 (D.

36

Me. 2002) ("[D]ebt collectors may rely on the information their clients provide, and the FDCPA does not require them to conduct their own investigation into the amount or validity of the underlying loan.") (citations omitted). "This remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161; *see also Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996)).

In addition, as the District Court noted, the *bona fide* error defense under the FDCPA is an affirmative defense. JA p. 574. "The Mavillas fail to recognize that ACS's burden to demonstrate it can prove an affirmative defense does not arise unless or until they, as plaintiffs, demonstrate they can offer evidence constituting a *prima facie* FDCPA claim." JA p. 574. Specifically, the District Court explained that after "careful scrutiny of the Complaint, together with the deposition transcripts of record, memoranda and supporting exhibits," it "failed to discover any evidence identified by the Mavillas of actionable conduct by ACS under the FDCPA." JA p. 575.

Even assuming that ACS *was* required to prove its *bona fide* error defense in the context of its summary judgment motion, there is ample uncontested evidence in the record to show that ACS had procedures in place to avoid errors in the collection process. First, account information is sent electronically to ACS for

collection. JA p. 175. Here, WakeMed sent electronic account information to ACS to collect payment for three specific services that WakeMed attributed to Mrs. Mavilla. In addition, ACS also received an itemized statement from WakeMed in order to verify the debt—that itemized statement showed that the charges were for Mrs. Mavilla. JA pp. 175-76; 266-68. Mrs. Mavilla even testified at her own deposition that after she called ACS to dispute the debt, ACS provided a WakeMed itemized statement in verification; her name was correctly spelled in the patient block, her husband's name was correctly spelled in the guarantor block, and her current address appeared in the patient/guarantor address block. JA pp. 421-22; 426. Mrs. Mavilla admitted that it was fair to assume that even if ACS made yet another a phone call to WakeMed to inquire about the disputed accounts, WakeMed would have told ACS the same thing that WakeMed told the Plaintiffs, which was that WakeMed believed that the services were properly charged to Mrs. Mavilla. JA pp. 431-32.

Thus, ACS had procedures in place that were reasonably adapted to avoid error, and ACS reasonably relied on the information provided to it by WakeMed. ACS was under no duty to individually investigate the validity of the debt. Accordingly, although not required to prove its affirmative defense because the Plaintiffs did not prove a *prima facie* case under the FDCPA, the preponderance of

the evidence nevertheless indicates that any alleged misconduct was a result of a *bona fide* error under § 1692k(c).

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR ACS ON ALL FCRA CLAIMS

### A. Standard of review

An appellate court reviews an award of summary judgment *de novo*. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). As discussed above, in determining whether summary judgment is appropriate, the court does not weigh evidence or make findings of fact, but rather must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 251-52.

### B. There is no private right of action under § 1681s-2(a) of the FCRA for allegedly filing "false" information to a CRA

The Plaintiffs argue that ACS reported false information to a CRA, which they contend is a violation of § 1681s-2(a) of the FCRA. The Plaintiffs further argue that because they disputed the debt with ACS before the information was reported to a CRA, ACS violated the FCRA when it allegedly failed to investigate the Plaintiffs' accounts. They also contend that ACS knew or should have known the information it was providing to the CRAs was false because of Mrs. Mavilla's prior communications with ACS and WakeMed.

39

However, there is no private right of action under § 1681s-2(a) of the FCRA for allegedly reporting inaccurate information to a CRA or failing to investigate the accuracy of information *before* the information is reported to a CRA. *Longman v. Wachovia Bank, N.A.*, __ F.3d __, 2012 WL 6604538, slip op. at *3 (2d Cir. Dec. 19, 2012); *SimmsParris v. Countrywide Fin. Corp.*, 652 F.2d 355 (3rd Cir. 2011); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 143, 149 (4th Cir. 2008).

For example, in *SimmsParis*, the plaintiff/consumer learned that a lender had reported to a CRA that some of her home mortgage payments were delinquent. The plaintiff believed that her payments were timely, so she wrote a letter to her lender stating that the lender had provided false information to the CRA. When the lender did not revise the information that had been provided to the CRA, the plaintiff sued the lender under the FCRA. The lender moved to dismiss the FCRA claims and that motion was granted. On appeal, the Third Circuit Court of Appeals affirmed the district court's decision, explaining that there is no private right of action for any alleged violation of § 1681s-2(a), the section entitled "duty of furnishers of information to provide accurate information," because § 1681n, governing civil liability for willful noncompliance, and § 1681o, which governs civil liability for negligent noncompliance, did not apply to subsections § 1681s-2(a). *SimmsParris*, 652 F.2d at 358 (citing 15 U.S.C. § 1681s-2(c)). § 1681s-2(c) states that the provisions under § 1681s-2(a) shall be enforced *exclusively* by federal and state

agencies. *Id.* Thus, the plaintiff/consumer in *SimmsParris* could not bring a private cause of action under § 1681s-2(a).

The same analysis applies to the Plaintiffs' claim in this case. No private right of action exists that could entitle the Plaintiffs to relief under this statute.

### C. The District Court properly dismissed the Plaintiffs' claims alleging a failure to conduct a reasonable investigation under § 1681s-2(b) because the Mavillas' claim was premature

The Plaintiffs allege that ACS failed to conduct a reasonable investigation as required by § 1681s-2(b). However, this claim was premature because the Plaintiffs filed their Complaint before the time had expired under that statute for ACS to conduct an investigation. In other words, there had been no breach of the statute at the time the Plaintiffs filed suit.

§ 1681s-2(b) establishes the duties and procedures that must be followed by one who furnishes information to a CRA *once there is notice of a dispute* from a consumer to a CRA. After a consumer notifies a CRA of a dispute about the consumer's credit information, the CRA must then notify the entity that furnished the credit information of the consumer's dispute. That furnishing entity then has thirty days under § 1681i(a)(1) to conduct a reasonable investigation to determine whether the disputed information is accurate. 15 U.S.C. § 1681s-2(b)(1)(A)-(E); *see also*, *Sweitzer v. Am. Express Centurion Bank*, 554 F. Supp. 2d 788, 795 (S.D. Ohio 2008) ("[G]enerally, liability for a § 1681s-2(b) violation arises 30 days after

the furnisher of information does not comply with its obligations outlined in § 1681s-2(b)(1)(A)-(D)").

In the present case, the District Court held that the Plaintiffs' FCRA claims against ACS were premature under § 1681s-2(b). JA p. 566. The District Court noted that the Plaintiffs first notified the CRA on September 27, 2010 that they were disputing the WakeMed services. JA p. 566. Less than a week later, on October 4, 2010, the Plaintiffs filed this suit. The District Court stated, however, that the statute gave ACS thirty days from the date it received notice from the CRA to conduct an investigation and report the results of the investigation to the CRA. JA p. 566. ACS therefore could not have violated the FCRA until that thirty day time period had expired. Because ACS still had at least twenty-three days remaining under § 1681i(a), ACS could not have breached the statute for allegedly failing to conduct an investigation under the FCRA at the time the Plaintiffs filed their suit.

Plaintiffs argue that there is no "30 day Safe Harbor" under the FCRA. Opening Brief pp. 47-49. This is a misunderstanding of the statute. Stated correctly, there can be no *breach* of § 1681s-2(b)(1) until the thirty day period under § 1691i(a) has expired. Plaintiffs also imply that furnishers of information like ACS are somehow obligated to act faster than the statute actually requires.

42

Nevertheless, the Plaintiffs' plea for an accelerated investigation period cannot change the express language in the statute.

However, even if the Court concludes that the Plaintiffs' suit was not premature, ACS's investigation of the matter was not unreasonable. It is uncontested that after ACS received a dispute notice from the CRA, ACS investigated this matter and verified that the account was accurate as it was reported to the CRA. JA pp. 465-73. Further, ACS accurately informed the CRA that two of the accounts had been paid and one account was disputed. JA pp. 465-73. As discussed above, WakeMed did not discover its accounting error until well after the Plaintiffs initiated their lawsuit. JA p. 98. Thus, no matter when ACS checked with WakeMed as to the status of the Plaintiffs' account prior to the suit, the result would have been the same—WakeMed would have told them the account belonged to the Plaintiffs. Mrs. Mavilla even admitted as such. JA pp. 431-32.

### D. The Plaintiffs failed to demonstrate any breach of § 1681s-2(b)(1)(A) or (B) because they did not show "the relevant information" provided by the CRA that ACS allegedly failed to review

Even if the Plaintiffs had waited an appropriate time to file their FCRA claims, they still failed to show that they had complied with other prerequisites under the statute. Pursuant to § 1681sa-2(b)(1), after ACS received notice from a CRA of the Plaintiffs' dispute, ACS was required to (1) conduct an investigation

with respect to the disputed information; (2) review all *relevant information provided by the CRA*, and (3) report the results of the investigation to the CRA. As the District Court noted in the Summary Judgment Order, the "record contains no documentation of if, when or how the Mavillas' provided notice to the CRA(s) to trigger the CRA(s)' notification to ACS… that the subject debts were disputed." JA p. 565; *see also* § 1681s-2(b)(1)(B). Furthermore, the District Court found that the Plaintiffs did not "indentif[y] the evidence by which they would demonstrate that the dispute Notice ACS received from the CRA included details of Mrs. Mavilla's physiological capacity to have received the services for which the debt allegedly was incurred." JA p. 566. Therefore, Plaintiffs did not point to any relevant information provided by the CRA, that ACS could have failed to review in the course of its investigation. The Plaintiffs' failure to demonstrate an essential fact correctly resulted in a proper entry of summary judgment in favor of ACS as to the Plaintiffs' claims under § 1681s-2(b)(1).

**E.    Even if the Mavillas had complied with § 1681s-2(b), the undisputed facts show that ACS still complied with the statutory requirements**

As noted above, under § 1681s-2(b)(1), after receiving notice of the Mavillas' dispute, ACS was required to (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided by the CRA, and (3) report the results of the investigation to the CRA. The documents that were

submitted as part of the summary judgment motions clearly show that ACS performed an investigation and reported the results to the CRA as required under § 1681s-2(b)(1). The account notes for each disputed account show that after ACS received a dispute notice from the CRA, ACS investigated the matter and verified that the account was accurate as it was reported to the CRA. JA pp. 467, 470, and 472. ACS accurately informed the CRA that two of the accounts had been paid and one account was disputed. JA pp. 467, 470, and 472.

The Plaintiffs claim that ACS's investigation could not have been reasonable because Mrs. Mavilla was allegedly physically incapable of receiving the disputed medical services. ACS was not the creditor for the disputed services. ACS did not provide any of the disputed medical services. ACS did not possess the original medical or billing records that formed the basis for the disputed accounts. The health care providers who provided the disputed medical services were not ACS employees. There is no reasonable way for a debt collector like ACS to conduct a medical evaluation of each consumer who disputes a medical debt in this manner. Further, an independent debt collector does not have an independent right to access the private medical records that would be necessary to perform such an analysis. There is no indication anywhere in the statute that Congress intended § 1681s-2(b)(1) to require an independent debt collector to make a medical evaluation in order to conduct a reasonable investigation into a disputed debt. Furthermore, as

the District Court ably explained, the reasonableness of an investigation by a furnisher is determined in light of all relevant information *provided by the CRA*. JA p. 568 (citing § 1681s-2(b)(1)). As discussed above, the Plaintiffs provided no evidence that the notifying CRA supplied any information that would remotely suggest that ACS undertake a medical evaluation in order to reasonably investigate the debt. JA p. 568.

The Plaintiffs further contend that ACS falsely verified the tradelines when it responded to the E-OSCAR request. This argument is simply a regurgitation of the Plaintiffs' prior arguments. Plaintiffs argue that WakeMed's subsequent request for ACS to remove the disputed WakeMed accounts from Mrs. Mavilla's credit history somehow demonstrates that ACS "falsely" verified the WakeMed accounts to the CRA. The flawed argument presumes that because WakeMed asked ACS to withdraw the data from the CRA after the Plaintiffs filed suit, WakeMed must have determined that the data was incorrect and any earlier "verification" by ACS under § 1681s-2(b) should have revealed this. This argument ignores the Plaintiffs' own testimony that even after they called WakeMed to dispute the debts and after WakeMed had done a separate investigation, WakeMed still believed that the medical services belonged to Mrs. Mavilla. JA pp. 457-58. In addition, testimony from Perkins—which the Plaintiffs do not dispute—indicates that WakeMed did not ask ACS to withdraw the data

from the CRA until well after the Plaintiffss filed this suit. JA p. 98. The Plaintiffs have not offered any factual support for their contention that ACS made any "false verification" to a CRA after WakeMed identified its error.

### F. The Plaintiffs essentially admit that any further inquiry by ACS to WakeMed would have been futile

The record, including Mrs. Mavilla's own testimony, indicates that any further investigation by ACS into the "medical viability" of these debts would have been futile. As explained previously, after the Plaintiffs received the first collection notice from ACS, but before the debts had been reported to a CRA, the Plaintiffs called WakeMed to dispute the charges for the services. JA p. 426. WakeMed then conducted its own investigation into the validity of the charges. Even with access to the disputed medical records and disputed billing records—and presumably access to the actual treating physicians—WakeMed *still* concluded that the disputed debts belonged to the Plaintiffs. JA pp. 427-28. There is no reason to think that *yet another* inquiry to WakeMed would have ended in a different result. Mrs. Mavilla admitted as much. JA pp. 431-32. Despite the Plaintiffs' suggestion to the contrary, the law should not require an entity to perform a futile act.

### G. Plaintiffs cannot prove that they suffered any damages as a result of ACS's alleged actions.

It is well established that a plaintiff suing under the FCRA shoulders the burden of demonstrating the existence of damages resulting from an alleged FCRA

violation; thus, the failure of an FCRA plaintiff "to produce evidence of damage resulting from a FCRA violation mandates summary judgment." *Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002) (citing *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991)). "Without a causal relation between the violation of the statute and a loss of credit, or some other harm, a plaintiff cannot obtain an award of actual damages." *Ruffin–Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 608 (7th Cir. 2005)

Plaintiffs' alleged damages include a denial of a Kohl's credit card application and the denial of a home refinancing loan with a particular lender. These claims of damages are legally deficient and factually incorrect.

As the District Court properly pointed out in the Summary Judgment Order, the Plaintiffs failed to demonstrate that their disputed damages were a proximate cause of any alleged violation of the FCRA by ACS. JA p. 567. As explained above, there could not have been a breach of the FCRA by ACS until the thirty day period under § 1682i(a)(1) had expired. The Plaintiffs allege that they notified the CRAs on September 27, 2010 regarding their dispute over the WakeMed services. Assuming that the CRAs immediately reported the dispute to ACS, ACS would have had until October 27, 2010 to comply with the statute. JA p. 567. Plaintiffs admit that the Kohl's application was denied in a September 21, 2010 letter and that the home refinancing loan was denied on our about September 22, 2010. JA p.

567. As the District Court explained, these denials of credit took place *before* the Plaintiffs reported a credit dispute to the CRA, *before* ACS received notice of that dispute, and *before* ACS's duty to investigate under the FCRA was triggered. JA p. 567. Thus, the Plaintiffs cannot prove that they suffered damages "as a proximate result of a breach of a duty that had not yet arisen." JA p. 567.

Mr. Mavilla also admitted that there were additional, independent reasons that could have caused the lender to deny the Plaintiffs' home loan refinancing request. Mr. Mavilla admitted in his deposition that approximately three months after the disputed information had been removed from his spouse's credit history, he reapplied for a refinancing loan with the same lender. JA pp. 381-82. Again the same lender denied the loan request. JA pp. 381-82. Mr. Mavilla admitted that the lender explained that the Plaintiffs' home was "underwater"—that he owed more on the existing loan than the home was currently worth—and therefore the lender would not refinance the mortgage. JA pp. 381-82. Mr. Mavilla has offered no evidence that the value of the Plaintiffs' home would have been any different when they first attempted to refinance. The reduced value of the Plaintiffs' home was an independent condition that could have independently caused the refinance application to be denied, even if the WakeMed accounts had not been reported to the CRA. Therefore, the Plaintiffs cannot demonstrate that but for the information reported to the CRA, they would have been able to refinance their mortgage.

49

## IV.    MR. MAVILLA HAS NO STANDING AS A PLAINTIFF

Should this Court conclude that ACS was not entitled to summary judgment on any of the federal claims based on the legal arguments outlined above, at a minimum, ACS is entitled to summary judgment as to Mr. Mavilla on all claims, because he is not entitled to relief under the relevant federal statutes.

As discussed above, an essential element of a claim for relief under the FCRA is a showing of actual damages. In this case, all the medical bills sent to ACS for collection were for services charged to Mrs. Mavilla. All phone calls and letters at issue were directed toward Mrs. Mavilla. All debts that were reported to the CRAs belonged to Mrs. Mavilla and appeared on Mrs. Mavilla's credit report. ACS did not owe any duty to Mr. Mavilla under the FCRA. The fact that Mr. Mavilla may have been tangentially affected by ACS's collection efforts does show that he sustained any damages that would entitle him to relief under the FCRA.

Furthermore, one must be a "consumer" in order to be entitled to relief under any of the subsections of the FDCPA cited by the Plaintiffs. 15 U.S.C. §§ 1692e(2)(A)(5) and (10); 15 U.S.C. § 1692f. Courts interpreting the meaning of "consumer" under the FDCPA have concluded that one cannot be a "consumer" simply by virtue of being the spouse of a "consumer." *See*, *e.g.*, *Carter v. Countrywide Home Loans, Inc.*, 2009 WL 2742560 at *10 (E.D. Va. Aug. 25,

2009). Because certain subsections of the FDCPA specifically provide relief for a "consumer's spouse," the "principles of statutory interpretation require that the narrower definition, excluding the consumer's spouse, be applied in those sections in which the definition of 'consumer' is not expanded." *Id.* (citing *Brown v. Gardner*, 515 U.S. 115, 120 (1994)); *see also Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) ("Where Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") Because Plaintiffs have never once alleged that Mr. Mavilla is obligated or even allegedly obligated to pay any debt in this case, he does not qualify as a "consumer" entitled to relief under the relevant portions of the FDCPA.

## V.    BECAUSE THE FEDERAL CLAIMS WERE PROPERLY DISPOSED OF BEFORE TRIAL, THERE IS NO NEED FOR THE DISTRICT COURT TO CONSIDER THE STATE CLAIMS

An appellate court reviews a district court's decision declining to exercise supplemental jurisdiction over state law claims for abuse of discretion. *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 203 (4th Cir. 1997)*; see also Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished."). As the Plaintiffs properly pointed out, "if the

federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Plaintiffs admit that the District Court "was within its discretion to dismiss the [Plaintiffs'] state law claims without prejudice" when the federal claims were disposed of. Opening Brief p. 52. Thus, because the federal claims were properly extinguished in favor of ACS before trial, no federal questions remain to support supplemental jurisdiction for the state law claims. Accordingly, there is no reason that the District Court should address the state law claims on remand.

## **CONCLUSION**

For the reasons stated above, the District Court (1) properly exercised its discretion in setting aside the Entry of Default against ACS; (2) properly granted summary judgment in favor of ACS on the FDCPA claims; (3) properly granted summary judgment in favor of ACS on the FCRA claims; and (4) properly exercised its discretion in declining to decide the state law claims once the federal claims had been disposed of. Thus, ACS respectfully requests that this Court affirm each of these decisions by the District Court in this case.

/s/ Sean T. Partrick
Sean T. Partrick
Allison J. Becker
Jennifer D. Maldonado
YATES, MCLAMB & WEYHER, LLP
Post Office Box 2889
Raleigh, North Carolina  27602
(919) 835-0900

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*12,968*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>May 31, 2013</u>          <u>/s/ Sean T. Partrick                    </u>
                                     *Counsel for Appellee*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 31st day of May, 2013, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Christopher W. Livingston
> 2154 Dowd Dairy Road
> White Oak, North Carolina  28399
> (910) 876-7001
>
> *Counsel for Appellants*

I further certify that on this 31st day of May, 2013, I caused the required copies of the Brief of Appellee to be hand filed with the Clerk of the Court.

/s/ Sean T. Partrick
*Counsel for Appellee*
